**In re NUCLEAR IMAGING SYSTEMS, INC., Debtor.**

**In re Cardiovascular Concepts, P.C., Debtor.**

**Nos. 00–19698F, 00–19697F.**

United States Bankruptcy Court, E.D. Pennsylvania.

Dec. 6, 2001.

Albert A. Ciardi, Jr., Philadelphia, PA, David Kraut, Blue Bell, PA, for debtor.

David B. Aaronson, Philadelphia, PA, Derek J. Allen, Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., Greensboro, NC, Jonathan D. Bennett, Cherry Hill, NJ, Michael A. Bloom, Philadelphia, PA, Morton R. Branzburg, Philadelphia, PA, Graham D. Guthrie, Purcell & Scott, Dublin, OH, Scott K. Intner, Whiteford Taylor & Preston LLP, Baltimore, MD, Andrew C. Kassner, Drinker Biddle & Reath, Philadelphia, PA, Lauri A. Krepto, Pepper Hamilton, LLP, Philadelphia, PA, Scott R. Lipson, Tallman, Hudders & Sorrentino, P.C., Allentown, PA, Leslie D. Locke, Chicago, IL, Thomas R. Merry, Purcell & Scott, L.P.A., Dublin, OH, Christopher R. Momjian, Office of Attorney General, Philadelphia, PA, James E. O'Neill, III, Philadelphia, PA, Maria K. Pum, San Diego, CA, Michael H. Reed, Philadelphia, PA, Linda J. Schwimmer, Lawrenceville, NJ, Ernest B. Thompson, Nashville, TN, David A. Vesel, Raleigh, NC, Ina S. Weiner, Philadelphia, PA, Robert D. Whaley, Whaley Letteer & Mock PC, Dallas, TX, for creditor.

## MEMORANDUM OPINION

BRUCE I. FOX, Chief Judge.

The law firm of Ciardi, Maschmeyer & Karalis, P.C. (referred to by the parties as "CMK"), which served as counsel to the debtors in two related cases (Nuclear Imaging Systems, Inc. and Cardiovascular Concepts, P.C.), has filed a fee application in each of those cases. These applications request an allowance of a chapter 11 administrative expense in each case of $48,467.12, as compensation for services rendered plus $7,690.72 for reimbursement of expenses incurred prior to the conversion of these cases to chapter 7. Taken together, the total chapter 11 administrative allowance requested is $96,934.25 in fees and $15,381.45 in expenses, aggregating $112,315.70.

The only objection to these applications was filed by Syncor International Corporation. As will be discussed below, Syncor, which holds a chapter 11 administrative

expense claim, does not object to the allowance of the sums requested by debtors' counsel. Rather, Syncor objected on the basis that the funds which have been allocated to pay such an award represent property of the estate and cannot be used to pay only the chapter 11 administrative expense of CMK. In addition, it argues in a post-hearing memorandum that an earlier settlement order be "modified" so that a secured creditor be directed to pay all or part of Syncor's outstanding chapter 11 administrative claim.

For the following reasons, I disagree with Syncor's assertion that CMK cannot retain the funds which have been designated by a secured creditor from its collateral to pay a portion of debtors' counsel's allowed fees. Further, the present fee applications cannot be used to address Syncor's claims against a secured creditor by which the objector now seeks payment of all or part of its outstanding administrative expense.

### I.

### A.

A hearing was held and the following facts were agreed upon by CMK, Syncor and the chapter 7 trustee.

These two cases began as chapter 11 cases on August 4, 2000. CMK was counsel to both debtors in possession. The parties have stipulated that Syncor provided radio-pharmaceutical goods and services to Nuclear Imaging Systems, Inc. (referred to by the parties as "NIS"). Ex. J–1 (Factual Stipulation), ¶ 10. These goods and services were provided after the commencement of the chapter 11 cases, and continued through April 22, 2001. Ex. J–1, ¶ 10.[1]

After these bankruptcy cases were filed, the debtors sought the use of cash collateral pursuant to 11 U.S.C. § 363(a), (e). Three entities asserted a security interest in cash collateral: the IRS, NPF X, Inc. and DVI Financial Services, Inc. Ex. J–8 (order of August 17, 2000). These three creditors consented to the debtors' use of cash collateral on terms contained in various consent orders entered between August, 2000 and April, 2001. *See* Ex. J–8. The debtors' right to use cash collateral expired on April 30, 2001. Ex. J–1, ¶ 14.

Syncor and the debtors have stipulated that DVI held a security interest in equipment, inventory and general intangibles belonging to the debtors, while NPF X, Inc. held a security interest in accounts receivable. Ex. J–1, ¶ 11. Both of these creditors were undersecured—that is, the value of their collateral was less than the amounts due these creditors. Ex. J–1, ¶ 12.

While operating as a chapter 11 debtor in possession, NIS purchased radio-pharmaceutical supplies and services worth $1,345,872.47 from Syncor. It paid Syncor only $884,500.00 for these goods and services, leaving $461,372.47 as a postpetition payable. Ex. J–1, ¶¶ 46–48. By an order dated August 15, 2001, Syncor was granted a chapter 11 administrative claim for that unpaid amount: $461,372.47. Ex. J–1, ¶ 27.

---

1. None of the parties to this dispute suggests that Syncor may only hold an administrative expense claim against the estate of NIS. Rather, this dispute has been presented as though Syncor holds an administrative claim against both bankruptcy estates. The consent order which granted Syncor an administrative expense provides that this expense is "against the estates of Nuclear Imaging Systems, Inc., *et al.*" Ex. J–7.

As my analysis of Syncor's objections would not change by focusing solely on the NIS estate, I have made various computations below consistent with the parties' presentation.

In the various consensual cash collateral orders approved by this court, $1,046,000.00 was "budgeted ... to pay for NIS's purchases from Syncor...." Ex. J–1, ¶ 49. In other words, attached to each order authorizing NIS's use of cash collateral was a cash flow projection covering the period for which cash collateral could be used by this debtor. Ex. J–8. These projections, *inter alia*, identified permitted expenditures by NIS. Among those identified expenditures was a line item for purchase of Syncor goods. The aggregate amount of these projected and authorized expenditures in the various cash collateral orders totaled $1,046,000.00. Ex. J–8.

These cash collateral orders all "authorized" the debtors "to use Cash Collateral to operate their business in accordance with the terms of this Order and the Budget attached thereto." Ex. 8, ¶ 1. Among the terms of each of the orders was the granting of "Section 507 Priority." Ex. 8, ¶ 7. This condition afforded each of the creditors who asserted an interest in cash collateral, including NPF, a "superpriority" claim to the extent that the value of their collateral declined postpetition. *See* 11 U.S.C. § 507(b).

On April 30, 2001, the two debtors sold many of their assets to Integral Nuclear Associates, LLC, pursuant to an asset purchase agreement. Ex. J–1, ¶ 22. Since that sale, the debtors have not operated and NPF X, Inc. has been collecting the proceeds of various receivables pursuant to its prepetition security agreement and its replacement lien provided in the cash collateral orders. Ex. J–1, ¶ 23.

In June, 2001, the debtors proposed an amended joint chapter 11 reorganization plan. Ex. J–5. As required by 11 U.S.C. § 1129(a)(9), this plan, *inter alia*, called for full payment of all outstanding chapter 11 administrative expense claims (unless the claimants agreed otherwise). Ex. J–5, ¶ 4.1. Unfortunately, the debtors were not able to confirm their proposed plan and both of these chapter 11 cases were converted to chapter 7 on August 20, 2001. Christine Shubert, Esquire was appointed interim chapter 7 trustee of both estates. Ex. J–1, ¶¶ 24–25.

Funds in the amount of $93,000.00 are currently held by these estates. Ex. J–1, ¶ 26. Approximately $761,000.00 in chapter 11 administrative expenses are unpaid, including the expense claim of Syncor, but not including chapter 11 professional fees. Ex. J–1, ¶ 28. The parties have agreed that the unpaid chapter 11 administrative fees of CMK, debtors' counsel exceed $200,000.00 in these two cases (inclusive of the instant fee applications). Ex. J–1, ¶ 28.

In other words, the two pending fee requests were not the first filed by CMK. By an earlier order, CMK was awarded an aggregate amount of $114,700.60 for both cases, less a prepetition retainer of $19,100.00. Ex. J–1, ¶¶ 39–40. Of this allowance, the law firm has received payment of only $25,000.00 to date. Ex. J–1, ¶ 43. Thus, the unpaid balance of the first order, plus the fees requested in these applications, exceed $200,000.00.

B.

Much of this dispute (from the point of view of both Syncor and CMK) revolves around the terms of an amended agreement reached in April 2001, which resolved a number of outstanding issues and thereby permitted the sale of the debtors' assets to Integral.

On or about April 17, 2001, I approved an "Amended Stipulation of Settlement," which was a settlement entered into among the two debtors, their principal shareholder (Jeffrey Mandler), DVI, IRS,

NPF [2] and Integral. Ex. J–5 (Settlement agreement attached as an exhibit to the Second Amended Reorganization Plan). Syncor was not a party to this agreement; nonetheless, as will be discussed below, it believes it has the right to seek the modification of the agreement's terms.

In relevant part, this agreement: permitted the debtors to continue to use cash collateral, but only through April 30, 2001; resolved a lawsuit brought by the debtors against NPF; dismissed an appeal of litigation between the IRS and NPF; granted NPF relief from the bankruptcy stay; addressed certain guarantees made by Mr. Mandler in favor of DVI and NPF; specified the allocation of some of the proceeds of the intended asset sale; provided for treatment of the IRS under a proposed chapter 11 plan; and required the IRS and NPF to agree to support the debtors' proposed chapter 11 plan.

More specifically, this amended agreement contained the following provisions which are emphasized by one or both parties in this dispute:

\*\*\*

4. *Carveout.* NPF X consents to a carveout under 11 U.S.C. § 506 in the amount of $125,000 from the Accounts for the benefit of CMK....

\*\*\*

6. *NPF Relief from Stay and Prohibition on Further Use of Cash Collateral.* Upon execution of this Agreement and on the earlier of the occurrence of the following ... (I) April 30, 2001 ... the Debtors shall be prohibited from further use of Cash Collateral and NPF shall have relief from the automatic stay ... to collect the Accounts ... of the Debtors, if any, and apply the proceeds therefrom to the NPF Claim.... The Debtors are authorized to pay all budgeted items under the prior Cash Collateral Orders and the Final Cash Collateral Order....

\*\*\*

11. *Distribution of Cash Portion of Purchase Price.* The cash portion of the proceeds from the Sale to Integral shall be distributed as follows:

(a) Up to $25,000 to CMK on account of its approved fees

. . . . .

(b) $25,000 to be distributed to unsecured creditors under the Plan;

\*\*\*

13. *Support of Plan.* NPF and the IRS agree to support the Debtors' Plan and Sale Approval Motion ... and NPF shall deliver to Debtors' counsel ballots as both secured and unsecured creditors accepting said Plan so long as the Plan is in conformity with the terms of this Agreement....

\*\*\*

15. *CMK Fee Applications.* NPF X shall withdraw their [sic] objections to the applications of Ciardi, Maschmeyer & Karalis, P.C. The Debtors and CMK, Debtors' counsel, agree that no claim shall be asserted against the DVI Collateral under section 506(c) of the Bankruptcy Code or otherwise.

\*\*\*

20. *Third Party Beneficiaries.* Nothing in this Agreement may be relied upon or is intended to for the benefit of any party other [than] those who have executed this Agreement below.

**2.** The settlement agreement refers to NPF VI, a predecessor of NPF X.

\*\*\*

22. *Severability*. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purposes of determining the legal enforceability of any provision.

Ex. J–5 (Amended Settlement Agreement).

As I mentioned above, CMK was previously awarded, by order dated April 17, 2001, fees and expenses (less prepetition retainer) totaling $47,800.00 for each of the two chapter 11 cases, or $95,600.00. Of that award, debtors' counsel has been paid to date $25,000.00, consistent with ¶ 11 of the Amended Settlement Agreement. Presently, the firm is also holding $125,000.00, which was "carved out"[3] of the proceeds of receivables serving as collateral for NPF X, Inc., in accordance with the express terms of the settlement agreement.

Thus, if the instant applications are approved and if CMK is permitted to retain the "carve out," CMK would receive a total of $150,000.00 for its representation of these two debtors. Its allowed fees and expenses, however, would exceed $207,000.00.[4]

## II.

Neither the chapter 7 trustee nor Syncor disputes that the fees and expenses sought in the instant applications filed by CMK are fair and reasonable within the meaning of 11 U.S.C. § 330(a). *See generally In re Busy Beaver Building Centers, Inc.*, 19 F.3d 833 (3d Cir.1994). Instead, Syncor argues that while debtors' counsel may be entitled to an allowance of its applications, CMK cannot retain the $125,000.00 it presently holds. Syncor maintained at the hearing on its objection that those proceeds must be paid to the chapter 7 trustee, who in turn must then distribute the funds to all presently outstanding chapter 11 administrative expense claimants *pro rata*.

CMK counters, and the chapter 7 trustee agrees, that the $125,000.00 it presently holds are the proceeds of a portion of the collateral of NPF X, Inc. By virtue of the parties' amended settlement agreement, NPF consented to CMK's receipt of those proceeds pursuant to 11 U.S.C. § 506(c). Thus, CMK argues neither Syncor nor any other chapter 11 administrative claimant is entitled to a distribution from those funds.[5]

---

**3.** As explained by one of my colleagues:

The term "carve out" is one of those uniquely bankruptcy phrases, much like "cram down," that appears nowhere in the bankruptcy statute but connotes definite meaning to parties. It is an agreement by a party secured by all or some of the assets of the estate to allow some portion of its lien proceeds to be paid to others, i.e., to carve out of its lien position. It commonly arises in two contexts. The first, applicable here, is where there are no unliened assets and the lien creditor agrees to release funds to unsecured creditors as an incentive to the Chapter 7 trustee to administer the assets. Carve outs are also common in Chapter 11 cases in favor of debtor's attorneys as part of cash collateral agreements.... In both these circumstances, it is essential to note that the carve out is a product of agreement between the secured party and the beneficiary of the carve out.

*In re White Glove, Inc.*, 1998 WL 731611, \*6 (Bankr.E.D.Pa.1998) (Sigmund, B.J.) (footnote and citation omitted).

**4.** As discussed below, retention of the "carve out" would result in a 72% distribution to CMK of its allowed chapter 11 expenses, inclusive of the prior payment.

**5.** The bankruptcy trustee correctly noted at the hearing on Syncor's objection that were the carve out funds held by CMK treated as property of the estate then she must first use them to pay chapter 7 administrative expenses—e.g., trustee commissions—before they can be paid to any chapter 11 administrative claimant. *Accord* 11 U.S.C. § 726(b). I shall return to this point later.

The contentions of Syncor and CMK stem from their realization that the two bankruptcy estates now administered by the chapter 7 trustee have insufficient cash on hand to permit the trustee to make a measurable distribution to chapter 11 administrative creditors. Furthermore, they both recognize that it is highly unlikely that the trustee will be able to liquidate estate assets sufficient to pay CMK's outstanding fees as well as the roughly $760,000.00 in outstanding, unpaid chapter 11 administrative expenses, which include the $461,372.47 owing to Syncor. Ex. J–1, ¶ 28. Therefore, Syncor (at least initially) is battling with CMK for recovery from the NPF "carve out," with the trustee supporting the position of CMK.

Syncor has not withdrawn its objection to CMK's two applications; nor has it receded from its position that "carve outs" from a secured creditor's collateral represent estate property. In its post-hearing memorandum, however, it appears to have shifted its main focus from claiming a right to the carve out proceeds now held by CMK to a demand against NPF for payment to it.

Upon consideration of the positions of the various parties, I must overrule Syncor's objections against the instant applications. Further, I find it appropriate to leave for another day resolution of Syncor's claims against NPF.

### A.

■ Section 506(c)[6] is an exception to the general bankruptcy principle that "expenses associated with administering a bankruptcy estate are not chargeable to a secured creditor's collateral or claim, but must be borne out of the unencumbered assets of the estate." L. King, 4 *Collier on Bankruptcy,* ¶ 506.05, at 506–122 (15th ed. rev.2000); *accord Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 5, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000). This statutory provision was intended by Congress to codify a number of decisions under the former Bankruptcy Act. *See* L. King, 4 *Collier on Bankruptcy,* ¶ 506.05 at 506–123.

■ It was generally accepted under the former Act that the collateral of a secured creditor could be surcharged with the expenses of the administration of the bankruptcy case only in those instances and only to the extent that the expenses provided a direct benefit to the secured creditor. *See In re Tyne,* 257 F.2d 310 (7th Cir.1958). Consistent with that exception, under present section 506(c), a trustee may recover administrative expenses from the collateral of a secured creditor if:

> (i) the expenses are "necessary" to preserve or dispose of the collateral, (ii) they are "reasonable" and (iii) the incurrence of expenses provided a "benefit" to the secured creditor.

L. King, 4 *Collier on Bankruptcy,* ¶ 506.05 at 506–122.

It was also accepted under the former Bankruptcy Act that the secured creditor could consent to the payment of such expenses without the necessity of any party to demonstrate any such benefit. *See generally Textile Banking Co. v. Widener,* 265 F.2d 446, 454 (4th Cir.1959). Thus, as summarized by Third Circuit Court of Appeals many years ago:

> The general rule of law, as stated by the learned District Judge, is that property

---

**6.** This subsection provides:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of

> preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

of the bankrupt subject to a mortgage lien is liable for cost and bankruptcy administration expenses only when there is a surplus realized at the sale of more than enough to pay the mortgage debt and interest.... The reason for the rule as stated by this court in the case of *In re Vulcan Foundry & Machine Co.,* 180 F. 671, is that the receiver and the trustee in bankruptcy are acting, not on the authority of the lienholders and for their interests, but on the authority of the court and for the interest of the general creditors. When acting in their behalf and spending money for their benefit, it is only just that they should pay the bill. But, when lienholders do not object and expressly or impliedly consent to the expenditure of money by the trustee in bankruptcy for the maintenance of the mortgaged property, an exception to the general rule prevails, and the expenses thus incurred must be paid by the lienholders.

*Robinson v. Dickey,* 36 F.2d 147, 149 (3d Cir.1929) (citations omitted).

The implied consent of a secured creditor to the surcharge of its collateral, however, was not easily inferred:

While there is authority for the proposition that one who has a lien on the property of a bankrupt is entitled to be paid in full out of the proceeds of the liened property subject only to prior liens and a contribution to the expense of administering the bankrupt estate not in excess of what it would have cost to foreclose the lien ... we think the true rule to be that, where a trustee sells a bankrupt's property free of liens, with the consent of the lienholders, the latter are chargeable not only with the actual costs of sale but also with expenses reasonably incurred in the preservation of the property ... and with the trustee's and referee's commissions payable with respect to the proceeds of the sale ... but with no other expenses of administration, except with their consent, express or implied....

Where, as here, the business of the debtor was carried on prior to the sale in the hope of reorganization the lienholder's forbearance in not foreclosing its lien, which enabled the business to be thus carried on in the mortgaged property, was obviously for the benefit of the debtor and its general creditors. The fact that the mortgagee did not press for foreclosure but consented to permit the business to be carried on in the mortgaged property should not be held to penalize it by postponing its lien to the expenses of operating the business, since to so hold would be to place a penalty upon a lien creditor for its forbearance and for the consideration which it has shown for general creditors. This of course is not to say that the lienholder should not bear the reasonable expenses of preserving the property, which expenses were clearly for its benefit.

*Miners Sav Bank of Pittston, Pa. v. Joyce,* 97 F.2d 973, 977 (3d Cir.1938) (citations omitted).

Moreover, under the former Act, a lien creditor's consent that a portion of administrative expenses could be paid from its collateral was enforceable only to the limit so agreed upon. Therefore, in *In re Bowen,* 46 F.Supp. 631, 637 (E.D.Pa.1942), the District Court reversed a decision of the Bankruptcy Referee which had surcharged the proceeds of collateral more than $20,000.00 when "the sale of the real estate was made subject to the stipulation that a sum not exceeding $4,000 would be borne by the lien creditors for expenses of administration...."

B.

The axiom that a secured creditor may consent to permit its collateral to be

surcharged and paid to an administrative claimant, though not stated in section 506(c), is unchanged under the Code. *See, e.g., Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. at 12, 120 S.Ct. 1942; *In re Flagstaff Foodservice Corp.,* 762 F.2d 10, 12 (2nd Cir.1985). As explained by one commentator:

> If the holder of a secured claim expressly consents to the payment of a specific administrative claim from its collateral, then the secured creditor's consent may be enforceable to ensure payment of the claim of the administrative claimant from the collateral.

L. King, 4 *Collier on Bankruptcy,* ¶ 506.05[6], at 506–134 (15th ed. rev.2000).

Recently, the Second Circuit Court of Appeals noted the continued ability of a secured creditor to consent to the surcharge of its collateral:

> Thus, absent an agreement to the contrary, a secured creditor's collateral may only be charged for administrative expenses, including attorney's fees, to the extent these expenses directly benefited that secured creditor. *See General Elec. Credit Corp. v. Levin & Weintraub (In re Flagstaff Foodservice Corp.),* 739 F.2d 73, 76 (2nd Cir.1984). However, if a secured party consents to allowing such administrative expenses, that party may be liable for such expenses even in the absence of conferred benefit, but "such consent is not to be lightly inferred." *Id.* at 77 (citation omitted). Further, "[i]t is not to be inferred merely because a secured creditor cooperates with the debtor." *Id.*

*In re Blackwood Associates, L.P.,* 153 F.3d 61, 68 (2nd Cir.1998).

While disputes may arise concerning the necessity, reasonableness and extent of benefit an administrative expense has provided to a secured creditor under section 506(c), *see generally In re Visual Indus-*

*tries, Inc.,* 57 F.3d 321 (3d Cir.1995), or whether the secured creditor impliedly consented to surcharge of its collateral, *see generally In re Orfa Corp. of Philadelphia,* 170 B.R. 257, 273 (E.D.Pa.1994), those issues are not implicated in the present fee applications or the objections thereto.

Under the terms of the amended stipulation of April 2001, quoted above, NPF expressly consented to the surcharge of its collateral in favor of chapter 11 administrative claimant CMK, up to $125,000.00. The provision is clear, and neither NPF nor the bankruptcy trustee opposes its enforcement. Nonetheless, Syncor initially maintained, and appears to still maintain, that the provision is only enforceable on behalf of the bankruptcy estate of these debtors rather than on behalf of CMK.

## III.

■ Syncor has never challenged the right of NPF to consent to permit $125,000.00 from the proceeds of its collateral to be used to pay chapter 11 administrative expenses. It does object, however, to the payment of those funds to CMK. Syncor's objection—and it repeats that contention in its post-hearing memorandum—is "that amounts recovered by a trustee under section 506(c) become part of the bankruptcy estate and must be distributed evenly among creditors according to the relative priorities of their claims." Syncor, Post-hearing Memorandum, at 10. Were this position correct, then all funds paid from collateral of NPF must be paid to the bankruptcy trustee, must be distributed by her to administrative expenses *pro rata,* and so cannot be earmarked for a particular administrative creditor such as CMK.

For the reasons that follow, I am not persuaded that Syncor's legal assertion is correct.

## A.

I note that Syncor's contention articulated at the hearing on its objection—that any carve out under section 506(c) must be paid to the bankruptcy trustee and distributed to unpaid chapter 11 administrative claims in accordance with section 726—overlooks section 726(b) and the agreed upon facts of this particular dispute.

If Syncor were correct and the $125,000.00 proceeds of NPF's collateral became estate property to be administered by the bankruptcy trustee, the chapter 7 trustee would distribute those funds as directed by the Code. By virtue of section 726(b), estate property would first be distributed to chapter 7 administrative claimants and then to chapter 11 administrative claimants *pro rata*. *See, e.g., Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 12 n. 4, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000). Moreover, distribution *pro rata* would require the trustee to take into account all payments already received by chapter 11 administrative claimants and not, as Syncor would prefer, simply consider what post-bankruptcy expenses are unpaid at the time of conversion. *See, e.g., In re Penn State Clothing Corp.,* 204 B.R. 161, 162 (Bankr. E.D.Pa.1997); *In re Florida West Gateway, Inc.,* 180 B.R. 299, 302—03 (Bankr. S.D.Fla.1995).

Syncor has already received about $884,500.00 from these bankruptcy estates. This is 66% of the value of the goods provided: about $1,345,800.00. It is 84% of the amounts budgeted for Syncor payments in the debtors' cash collateral orders: $1,046,000.00. CMK has only received $25,000.00 to date, or just 12% of its outstanding fees: about $207,000.00. Were CMK to receive the $125,000.00 carve out, its percentage distribution would increase to 72%. Of course, if some of these funds were first used to pay future chapter 7 administrative expenses, CMK's payment percentage would decrease.

Thus, even if Syncor's contention were correct, CMK would receive most of the $125,000.00 on hand after payment of chapter 7 administrative expenses, because it has only received 12% of its allowed expense while other chapter 11 claimants, such as Syncor, have already received a 66% distribution.[7]

Recognizing this difficulty, Syncor has modified its challenge.[8] In its post-hearing memorandum, it argues that it would be unfair for CMK to receive a 72% distribution while Syncor receives only 66%.

---

7. Although the approved cash collateral orders in these cases provided section 507(b) "superpriority" status to the three consenting lien creditors in certain circumstances, I cannot determine from evidence presented whether those circumstances have occurred. Of course, the existence of "superpriority" claims would reduce the distribution by the trustee to chapter 11 administrative expense claimants. *See generally In re Summit Ventures, Inc.,* 135 B.R. 478 (Bankr.D.Vt.1991).

8. At oral argument, Syncor's counsel also complained that the carve out provision of ¶ 4 of the amended stipulation is not enforceable in favor of CMK as written because the debtors allegedly failed to comply with the terms of ¶ 20 of that agreement. Paragraph 20, mentioned earlier, in part, authorized the debtors to pay all budgeted items of their cash collateral orders. These expenses were not paid. Thus, Syncor maintained that CMK should not obtain the benefit of its carve out agreement without payment of outstanding expenses identified in the cash collateral orders.

This position is not mentioned in Syncor's post-hearing memorandum and so I do not discuss it. Syncor's unwillingness to press this issue may stem from a realization that, were its argument accepted, the result may be the return to NPF of the $125,000.00 now held by CMK.

Both are chapter 11 administrative claimants and, Syncor maintains, must be treated equally under section 726. It offers two methods of addressing this potential disparity.

One method Syncor suggests would be for me to direct NPF to pay all outstanding expense claims which were authorized to be paid under the cash collateral orders. This would increase the distribution made to Syncor without depriving CMK of its carve out.[9] The second method proposed by Syncor is to modify the approved April, 2001 settlement agreement which provided, in paragraph 11, that $25,000.00 of the Integral sale proceeds would be distributed to unsecured creditors under the terms of a confirmed plan. Ex. J–5, amended settlement agreement, ¶ 11(b). Syncor proposes that I now simply order whomever received the $25,000.00 in sale proceeds (and the evidentiary record does not disclose that fact, but it is probably NPF) to pay it to Syncor. Syncor's Post-hearing Memorandum, at 13–14.

However, Syncor's underlying premise—that funds a secured creditor "carves out" from the proceeds of its collateral in favor of a particular chapter 11 administrative claimant become estate property to be distributed in accordance with the priorities established by the Bankruptcy Code—is unpersuasive. Thus, its complaint that CMK's chapter 11 administrative expense would be illegally preferred over Syncor's—were CMK entitled to retain the carve out—is unwarranted.

### B.

As Syncor acknowledges, its position has been squarely rejected by a recent decision of the Ninth Circuit Court of Appeals: *In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d 1061 (9th Cir.2001).

In *Debbie Reynolds*, a secured creditor "entered into an agreement allowing Debtor's counsel to collect a $50,000 surcharge from its secured property." *Id.*, 255 F.3d at 1064. This agreement also provided that no other creditor may seek a surcharge under section 506(c). *Id.* This agreement was challenged by a creditor who had lent money to the chapter 11 debtor postpetition and who had received a "superpriority" claim under section 364(c). *Id.* The objecting creditor raised two issues: whether the agreement could validly bar another creditor from seeking a surcharge; and whether the $50,000.00 is estate property which must be distributed according to the priorities established in the Code. *Id.*, 255 F.3d at 1064.

As to the first issue, the Ninth Circuit held that the Supreme Court's decision in *Hartford Underwriters*, 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1—which determined that a creditor has no standing to raise a claim under section 506(c)—deprived this superpriority creditor of any right to challenge that portion of the agreement which barred creditors from seeking relief under 506(c). As to the second issue, the one more germane to the instant dispute, the Circuit Court held:

> We agree with Appellants and hold that a § 506(c) surcharge is not an administrative claim, but an assessment against a secured party's collateral. *In re Mall at One Assoc. L.P.*, 187 B.R. 476, 480 (Bankr.E.D.Pa.1995). As such, it does not come out of the debtor's estate, but rather comes directly from the secured

---

9. By this approach, Syncor would receive at least $1,046,000.00 on its post-bankruptcy claim of $1,345,872.00. This would yield at least a 77.7% distribution to Syncor. The objector does not explain in its memorandum why it is improper for CMK to receive a 72% distribution when Syncor would be paid only 66%, while it would be proper for Syncor to receive a greater percentage distribution than CMK.

party's recovery. Consequently, § 506(c) expenses do not fall within the priority scheme of the Bankruptcy Code at all. These expenses "are paid first out of the proceeds of the sale, before a secured creditor is paid." *United States v. Federal Deposit Insurance Corporation*, 899 F.Supp. 50, 55 (D.R.I.1995); *In re Anderson*, 66 B.R. 97, 99 (9th Cir. BAP 1986) ("We read the Code to provide for payment of the trustee's direct costs of sale out of the proceeds of the sale before distribution to the secured creditors.").

*Id.*, 255 F.3d at 1067.

Syncor argues that the Ninth Circuit's analysis—holding that a surcharge agreement does not yield estate property payable to the bankruptcy trustee—is incorrect and refers to decisions such as *In re Ben Franklin Retail Store, Inc.*, 210 B.R. 315 (Bankr.N.D.Ill.1997) as holding to the contrary.[10] It is equally true, however, that decisions pre-dating *Debbie Reynolds* support the Ninth Circuit's analysis. *See, e.g., In re White Glove, Inc.*, 1998 WL 731611, *7 n. 22 (Bankr.E.D.Pa.1998).

For example, in *In re SPM Manufacturing Corp.*, 984 F.2d 1305 (1st Cir.1993), the First Circuit Court of Appeals addressed the validity of an agreement between an undersecured creditor and a chapter 11 creditors' committee, whereby a portion of the proceeds of the lienholder's collateral would be paid to the committee for distribution only to non-insider, non-priority unsecured creditors. Upon conversion of the case to chapter 7, the trustee and former shareholders of the debtor objected to such a payment on the basis that the agreement violated the priority provisions of the Bankruptcy Code. The Bankruptcy Court refused to approve the distribution agreement and required that the committee's dividend be paid to the chapter 7 trustee "who shall administer the same in accordance with the provisions of the Bankruptcy Code including the Code's provisions concerning priority for tax claims." *Id.*, 984 F.2d at 1310.

The First Circuit reversed, noting that the funds to be distributed to the committee would have been payable under section 726 solely to the secured creditor but for its agreement:

Because Citizens' secured claim absorbed all of SPM's assets, there was nothing left for any other creditor in this case. Ordinarily, in such circumstances, the distributional priorities of sections 726 and 507 would have been mooted. Appellees defend the outcome below on the ground that the Agreement improperly syphoned proceeds to the general, unsecured creditors "at the expense of priority creditors." However, it is hard to see how the priority creditors lost anything owed them given the fact there would have been nothing left for the

---

**10.** While the court in *Ben Franklin* did express an opinion that consensual surcharged funds under section 506(c) are estate property and cannot be earmarked to any particular administrative claimant, the objector was not seeking such relief. Instead, the court in *Ben Franklin* was addressing objections by counsel to an official creditors' committee and by the United States trustee to a carve out agreement between a secured creditor and chapter 11 debtor's counsel. The objectors argued that it was improper under the Code for a secured creditor to agree to pay the adminis-

trative expense of one chapter 11 professional but not of others.

Less apposite is a decision Syncor referred to in oral argument: *In re Old Island Golf Club, LLC,* 259 B.R. 643 (Bankr.E.D.Tenn. 2001). This opinion addressed whether a chapter 11 debtor may use cash collateral to pay a portion of its counsel fees, where such payment was agreed to by the secured creditor but the payment was made after its authority for cash collateral use had expired. The only objecting party was the secured creditor.

priority creditors after the $5 million was distributed to Citizens. The "syphoning" of the money to general, unsecured creditors came entirely from the $5 million belonging to Citizens, to which no one else had any claim of right under the Bankruptcy Code.

\*\*\*

Appellees argue, in the alternative, that the Agreement conflicts with the spirit of the Code's distribution scheme, under which priority creditors always get paid in full before general, unsecured creditors receive anything. Appellees contend that Congress never wanted unsecured creditors—especially creditors represented by the official creditors' committee—to be able to "circumvent" this scheme by negotiating with secured creditors to increase the return received for their claims against the debtor. Appellees' theory, however, goes beyond anything appearing expressly or by implication in the Code. Section 726 and the other Code provisions governing priorities of creditors apply only to distributions of property of the estate. The Code does not govern the rights of creditors to transfer or receive nonestate property. While the debtor and the trustee are not allowed to pay nonpriority creditors ahead of priority creditors ... creditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including to share them with other creditors.

*Id.*, 984 F.2d at 1312, 1313.

Syncor contends, nonetheless, that the Supreme Court's recent decision in *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.* refutes the conclusions reached in *Debbie Reynolds* and *SPM Manufacturing* and supports its interpretation that funds paid from the collateral of a secured creditor must be treated as estate property.

In *Hartford Underwriters* the Court held that section 506(c) must be construed as written, meaning that only the bankruptcy trustee has standing to seek surcharge relief under section 506(c). Since prior, non-Supreme Court decisions which had restricted standing under this subsection solely to the bankruptcy trustee had, in part, so held after concluding that any recovery under section 506(c) was estate property to be distributed according to Code established priorities and with equality of treatment to creditors of the same priority level, *see In re JKJ Chevrolet, Inc.*, 26 F.3d 481, 484 (4th Cir.1994); *In re Oakland Care Center, Inc.*, 142 B.R. 791, 794 (E.D.Mich.1992), Syncor extrapolates that the Supreme Court's standing decision was an endorsement of that viewpoint.

Syncor's analysis of *Hartford Underwriters*, however, overlooks that the Court expressly declined to address whether property recovered by a bankruptcy trustee under section 506(c) must be distributed directly to the creditor who provided the benefit to the secured creditor or must be distributed under the priority scheme set out in the Code. The Supreme Court explained its refusal to address that issue:

The frequency with which such circumstances arise [*i.e.*, a trustee's unwillingness to seek relief under section 506(c)] may depend in part on who ultimately receives the recovery obtained by a trustee under § 506(c). Petitioner argues that it goes to the party who provided the services that benefitted collateral (assuming that party has not already been compensated by the estate). Respondent argues that this reading, like a reading that allows creditors themselves to use § 506(c), upsets the Code's priority scheme by giving administrative claimants who

benefit collateral an effective priority over others—allowing, for example, a Chapter 11 administrative creditor (like petitioner) to obtain payment via § 506(c) while Chapter 7 administrative creditors remain unpaid, despite § 726(b)'s provision that Chapter 7 administrative claims have priority over Chapter 11 administrative claims. Thus, respondent asserts that a trustee's recovery under § 506(c) simply goes into the estate to be distributed according to the Code's priority provisions. Since this case does not involve a trustee's recovery under § 506(c), we do not address this question, or the related question whether the trustee may use the provision prior to paying the expenses for which reimbursement is sought, *see In re K & L Lakeland, Inc.*, 128 F.3d 203, 207, 212 (C.A.4 1997).

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. at 12 n. 4, 120 S.Ct. 1942.

The Ninth Circuit believed its conclusions in *Debbie Reynolds* were consistent with the holding of *Hartford Underwriters* and I agree.

First, the issue both in *Debbie Reynolds* and in this present dispute involves the enforcement and validity of an agreement by which the secured creditor has consented to pay an administrative claimant. The *Hartford Underwriters* decision implies that such creditor consent is materially different from any statutory recovery by a trustee under section 506(c), because the Supreme Court notes that a post-bankruptcy claimant may protect itself from non-payment by the bankruptcy estate by, *inter alia*, "insist[ing] on cash payment, or contract[ing] directly with the secured creditor. . . ." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. at 12, 120 S.Ct. 1942. In essence, in

April, 2001, CMK directly contracted with NPF for partial payment of its fees, as suggested by the Court.

Second, the Supreme Court's reference in footnote 4 to *In re K & L Lakeland, Inc.*, 128 F.3d 203 (4th Cir.1997) reflects the Court's recognition of certain implications of its standing decision under section 506(c).

If Syncor's interpretation of 506(c) were correct, then a bankruptcy trustee would be empowered to seek surcharge relief in those circumstances permitted by that subsection for goods and services provided by a particular chapter 11 administrative claimant—*e.g.*, a utility provider—without any requirement that this claimant be repaid for such goods and services. If all recoveries under section 506(c) are treated as estate funds to be paid according to statutory priorities, then section 507(b) "superpriority" claimants, as well as post-conversion chapter 7 administrative creditors—none of whom may have provided any direct benefit to the secured creditor—would be paid first under section 726 and could well extinguish all of the recovered funds. Even if there are no claims with a greater priority than chapter 11 administrative expenses, so that all funds recovered by a trustee or debtor in possession under section 506(c) are to be distributed *pro rata* to those claimants, the entity that provided the direct benefit to the secured creditor may not be reimbursed in full.

It is highly unlikely that Congress intended to enact a statutory provision designed to codify decisions which prevented a secured creditor's "unjust enrichment," *see, e.g., In re Foremost Mfg. Co.*, 137 F.3d 919, 923 (6th Cir.1998) ("The plain purpose of § 506(c)—to prevent unjust enrichment of secured creditors . . .") without also intending that the entity which provided this benefit be repaid. Otherwise, the "unjust

enrichment" is simply being transferred from the secured creditor to the creditors with the highest priorities.

The Fourth Circuit, in *In re K & L Lakeland, Inc.*, 128 F.3d 203, 207, 212 (4th Cir.1997), provided one method for addressing this concern by conditioning the trustee's recovery under section 506(c) to those expenditures which the estate has already paid. *See also In re Air Center, Inc.*, 48 B.R. 693 (Bankr.W.D.Okla.1985). With that limitation, the trustee may treat the surcharged funds as estate property, to be distributed according to the Code priorities, but the administrative expenses which provided the direct benefit to the secured creditor would already have been satisfied. This statutory construction, inferentially noted by the Supreme Court, eliminates the unjust enrichment problem.

Indeed, the Fourth Circuit, which had predicted the Supreme Court's restriction of standing under section 506(c) to the bankruptcy trustee in *JKJ Chevrolet*, explained that it had been understood by some courts that a trustee could not surcharge collateral for administrative expenses that had not been satisfied by the estate. Indeed, the appellate court concluded that this understanding was a component of the trustee's standing under section 506(c):

> The common law exception permitted a holder of secured collateral to be surcharged only when "a debtor, debtor in possession or trustee had expended funds to preserve or dispose of the very property (collateral) securing the debt." *In re Visual Indus., Inc.*, 57 F.3d 321, 324 (3d Cir.1995). A variety of expenditures were allowed—"appraisal fees, auctioneer fees, advertising costs, moving expenses, storage charges, payroll of employees directly and solely involved with the disposition of the subject property, maintenance and repair costs, and

marketing costs," 3 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 506.06, at 506–60 (15th ed.1996)—but there were two keys: (1) there had to be actual expenditures that (2) directly related to the preservation or disposal of the secured creditor's collateral. *Cf. Visual Indus.*, 57 F.3d at 325. Congress's intent in enacting § 506(c) was to codify both aspects:

> Any time the trustee or debtor in possession expends money to provide for the reasonable and necessary cost and expenses of preserving or disposing of a secured creditor's collateral, the trustee or debtor in possession is entitled to recover such expenses from the secured party or from the property securing an allowed secured claim held by such party.

124 Cong.Rec.H11089 (Sept. 28, 1978) (statement of Rep. Edwards), reprinted in U.S.Code Cong. & Admin.News 1978 pp. 5787, 6451 (emphases added).

This legislative intent is fully consonant with the plain meaning of the statute that we determined in *JKJ Chevrolet*. *In re K & L Lakeland, Inc.*, 128 F.3d at 207.

■ After *Hartford Underwriters*, administrative claimants may not seek relief under section 506(c). It does not follow, however, that such claimants are prohibited from contracting directly with a secured creditor for payment from the proceeds of that creditor's collateral. *See, e.g., In re Debbie Reynolds Hotel & Casino, Inc.; In re SPM Manufacturing Corp.* Nor does it follow that those proceeds—which would otherwise be payable solely to the secured creditor but for its consent to transfer property to a particular administrative claimant—must be paid to the trustee as estate property. If the trustee has not used estate funds to pay the administrative claimant, the trustee (and thus the estate)

is not entitled to carve out from or surcharge the proceeds of collateral so that she may distribute them to entities that provided no benefit to the secured creditor.[11]

In this dispute, NPF was an undersecured creditor who, but for its agreement with CMK, would have received the $125,000.00 created upon the liquidation of its collateral. CMK is an entity who had been paid previously only a small portion of its anticipated administrative expense. For the reasons just articulated, I reject Syncor's contention that an expressly agreed upon carve out of secured creditor proceeds cannot be enforced as these parties intended, but must instead be treated as estate property payable to the trustee and to be distributed according to the priority scheme of section 726.

## IV.

■ Syncor appears to appreciate in its post-hearing memorandum the effect in this case were the NPF carve out treated as estate funds. Therefore, it also suggests that CMK be permitted to retain the $125,000.00 NPF carve out; however, Syncor argues that NPF X, Inc. should be ordered, pursuant to the terms of the court approved amended settlement agreement, to pay it the sums the debtor was authorized to pay under the terms of the cash collateral order, or at least the $25,000.00 which was earmarked to be paid to unsecured creditors under the terms of the proposed, but never confirmed, amended joint chapter 11 plan. It supports its alternative position by positing that the amended settlement agreement—to which it was not a party—may be "modified" at

Syncor's request by virtue of Fed. R.Bankr.P. 9024 or 7071 (incorporating Fed.R.Civ.P. 60 and 71).

The merits of this "modification" request, if any, cannot now be determined. To do so would require the adjudication of the rights of NPF in the context of these applications for an allowance of compensation filed by counsel to the two debtors.

The applications may have been served upon NPF; Syncor's objection to compensation may have been served as well. But NPF had no opposition to the relief sought by CMK, did not appear at the hearing on the objection, did not participate in the stipulated evidentiary record, and had no reasonable basis to construe Syncor's objection as more than a contest between CMK and Syncor over the $125,000.00 carve out. Thus, it is inappropriate to consider Syncor's revised theories—first mentioned in its post-hearing memorandum—which assert claims against NPF.

■ "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314–15, 70 S.Ct. 652, 94 L.Ed. 865 (1950). An objection by a creditor to an application for compensation filed by debtor's counsel is not an appropriate procedural vehicle to address the rights of Syncor and NPF *inter se*, especially claims first raised in a post-hearing submission. *See In re Fazio*, 57 B.R. 316, 317 (Bankr.E.D.Pa. 1986) (insufficient notice was provided

---

11. The Supreme Court did not decide whether the statutory interpretation of *K & L Lakeland* is correct. Thus, I do not now determine whether a trustee may seek recovery under section 506(c), based upon an unpaid administrative expense, if the trustee can demonstrate that the expense would be later repaid in full from estate funds, including the funds recovered under section 506(c).

where "the debtor's counsel failed to indicate in his fee application and accompanying notice to creditors that fees were sought under 11 U.S.C. § 506(c)"); *compare Matter of Senior–G & A Operating Co., Inc.*, 957 F.2d 1290 (5th Cir.1992):

PSI next argues that it was never served a summons and complaint requiring it to appear before the bankruptcy court and defend a demand. PSI further contends that "no motion for surcharge was ever properly brought before the Bankruptcy Court." Therefore, according to PSI, it was denied due process and the surcharge cannot stand. We disagree. We think that the bankruptcy court's order, directing PSI to show cause why it should not be surcharged for its share of Timco's expenses, fairly brought PSI before that court. PSI was afforded notice and an opportunity to be heard. Indeed, after that hearing, the bankruptcy court dismissed the show cause order and held that PSI would not be ordered to pay any of Timco's expenses "at [that] time." Furthermore, the motion filed by the trustee asking that the court reconsider its award to Timco of its charges as administrative expenses or, in the alternative, to surcharge PSI with its share of those expenses was properly entertained by the bankruptcy court. On that occasion, PSI was, again, given notice and an opportunity to be heard.... In this case, PSI knew of the pendency of the action seeking surcharge of PSI for a portion of the workover expenses and it had an opportunity to present its

objections. We find no denial of due process to PSI.

*Id.*, 957 F.2d at 1297–98 (citations omitted); *cf. In re Concord Marketing, Inc.*, 268 B.R. 415 (Bankr.D.N.J.2001) (an administrative claimant's surcharge motion is insufficient notice to creditors under section 363(b) that the trustee has attempted to assign his rights under section 506(c) to that claimant).

The docket entries reflect that Syncor has already filed a motion "to enforce" the amended settlement agreement. (Docket entry # 433.) NPF X, Inc. has filed a response in opposition thereto. (Docket entry # 456.) [12] Syncor's recent contention in this objection that NPF X, Inc. must pay it certain funds are more appropriately decided in the context of that pending contested matter than in this one.[13]

Thus, an order shall be entered which denies Syncor's objection to the instant applications, permits CMK to retain the carved out funds, and leaves to a later day the resolution of Syncor's dispute with NPF.

**ORDER**

AND NOW, this 6th day of December, 2001, for the reasons stated in the accompanying memorandum, it is hereby ordered that the two fee applications filed by the law firm of Ciardi, Maschmeyer & Karalis, P.C. ("CMK") are granted and the objections filed by Syncor International Corporation to the allowance of fees and expenses and to their payment from the proceeds of collateral presently held by

**12.** In *Hartford Underwriters*, the Supreme Court declined to address whether a creditor not a party to a bankruptcy dispute may seek to enforce an order resolving that dispute pursuant to Fed.R.Bankr.P. 7071 (incorporating Fed.R.Civ.P. 71). *Id.*, 500 U.S. at 6 n. 2, 111 S.Ct. 1562.

**13.** Indeed, upon receipt of Syncor's post-hearing memorandum, NPF X, Inc. first realized that the objector had altered its focus so as to demand payment from that creditor; thus, NPF filed a "response" in opposition to the memorandum. This response, in part, simply incorporates NPF's opposition to Syncor's Rule 7071 motion.

CMK are overruled. Specifically, it is ordered that:

1. the law firm of Ciardi, Maschmeyer & Karalis, P.C. is allowed a chapter 11 administrative expense under 11 U.S.C. § 330(a) of $48,467.12, as compensation for services rendered, plus $7,690.72 for reimbursement of expenses in connection with its pre-conversion representation of the debtor in Bankr.No. 00–19698, in addition to the fee award previously made;

2. the law firm of Ciardi, Maschmeyer & Karalis, P.C. is allowed a chapter 11 administrative expense under 11 U.S.C. § 330(a) of $48,467.12, as compensation for services rendered, plus $7,690.72 for reimbursement of expenses in connection with its pre-conversion representation of the debtor in Bankr.No. 00–19697, in addition to the fee award previously made; and

3. these awards in favor of CMK rendered under section 330(a) may be satisfied by the funds held by CMK which have been carved out from the proceeds of NPF X, Inc. in accordance with the agreement between those two parties.