RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0097p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

IN RE: CONCO, INC.,

>> *Debtor.*

_____

TOM HARPER; SANDRA KRUMMA; PEGGY SUE LEAKE; SAMUEL ZANE LEAKE; JON SOUDER; CONCO ACQUIREMENT, LLC; DELFASCO LLC,

>> *Appellants,*

*v.*

THE OVERSIGHT COMMITTEE; CONCO, INC.,

>> *Appellees.*

No. 16-6166

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:16-cv-00125—Joseph H. McKinley Jr., Chief District Judge.

United States Bankruptcy Court for the
Western District of Kentucky at Louisville
No. 12-34933(1)(11)—Joan A. Lloyd, Judge.

Argued: March 8, 2017

Decided and Filed: April 28, 2017

Before: DAUGHTREY, SUTTON, and DONALD, Circuit Judges.

---

### COUNSEL

**ARGUED:** David S. Kaplan, KAPLAN & PARTNERS LLP, Louisville, Kentucky, for Appellants Harper, Krumma, Leake, and Souder. Cory J. Skolnick, FROST BROWN TODD LLC, Louisville, Kentucky, for Appellants Delfasco and Conco Acquirement. James R. Irving, BINGHAM GREENEBAUM DOLL LLP, Louisville, Kentucky, for Appellee Oversight Committee. Neil C. Bordy, SEILLER WATERMAN LLC, Louisville, Kentucky, for Appellee Conco, Inc. **ON BRIEF:** David S. Kaplan, Casey L. Hinkle, KAPLAN & PARTNERS LLP, Louisville, Kentucky, for Appellants Harper, Krumma, Leake, and Souder. Cory J. Skolnick,

John S. Egan, Edward M. King, FROST BROWN TODD LLC, Louisville, Kentucky, Gilbert Backenroth, HAHN & HESSEN LLP, New York, New York, for Appellants Delfasco and Conco Acquirement.    James R. Irving, John K. Bush, C.R. Bowles, Jr., BINGHAM GREENEBAUM DOLL LLP, Louisville, Kentucky, for Appellee Oversight Committee.  Neil C. Bordy, Keith J. Larson, SEILLER WATERMAN LLC, Louisville, Kentucky, for Appellee Conco, Inc.

---

**OPINION**

---

BERNICE BOUIE DONALD, Circuit Judge.  This matter is before the court on appeal from a February 18, 2016 Memorandum Opinion and Order (the "February 18, 2016 Decision) of the United States Bankruptcy Court for the Western District of Kentucky ("Bankruptcy Court") in the Chapter 11 bankruptcy case *In re Conco, Inc.*, No. 12-34933-jal (Bankr. W.D. Ky.).  In that opinion and order, the Bankruptcy Court interpreted Conco Inc.'s Confirmed Plan to prohibit the sale of the ESOP-held Conco stock (the "Equity Security Interests" in the Debtor) from being sold or transferred through December 31, 2018, and enjoined any such sale until that time.  The United States District Court for the Western District of Kentucky ("District Court") affirmed, finding that the Bankruptcy Court properly found that the Confirmed Plan prohibited the sale of the Equity Security Interests through December 31, 2018, and the Disclosure Statement containing identical language was adequate.  Since the proper standard of review is abuse of discretion, and the Bankruptcy Court did not abuse its discretion, we **AFFIRM** the Bankruptcy Court's opinion and order.

I.

Conco, Inc. ("Conco" or the "Debtor") manufactures containers used by the United States Armed Forces and contractors who provide ammunition to the United States Armed Forces. All of the stock of Conco is held by the Conco, Inc. Employee Stock Ownership Plan and Trust (the "ESOP"), a defined contribution employee benefit plan.  Appellant-Participants are all former employees of the Conco who are participants in the ESOP (the "Appellant-Participants").

On November 5, 2012 (the "Petition Date"), Conco filed a petition for voluntary relief under title 11 of the United States Code.  Shortly after the Petition Date, and throughout the

course of the Chapter 11 proceedings, Delfasco, LLC, ("Delfasco" and together with the Appellant-Participants, the "Appellants") Conco's primary competitor, expressed interest in acquiring Conco's assets. These attempts proved to be unsuccessful. Conco's main customers, General Dynamics and the United States Department of the Army, opposed Delfasco's efforts to acquire control of Conco, with both customers declaring they would terminate their contracts with Conco in the event Delfasco was successful.

On September 3, 2013, Conco filed its initial plan of reorganization, which provided that the holders of Equity Security Interests (referred to in the plan as the "equity securities in the Debtor" and classified as Class 4 interests) would retain those interests, Conco's business would not be sold, and general unsecured creditors (the "UCC" or Class 3 creditors) would receive approximately sixteen cents on the dollar for their claims. The creditors committee, among others, objected to this plan. Conco proposed several more plans, each increasing the amount the Class 3 creditors would receive and all containing the same language regarding the Class 4 Equity Security Interest. After extensive arm's length negotiations with Conco, General Dynamics, and Delfasco, the UCC determined it was in the best interest of the creditor body to reject Delfasco's efforts to purchase control of Conco.

As a result of the parties' negotiations, the UCC agreed to support the Debtor's Third Amended Plan of Reorganization that provided both defined distributions and contingent distributions, which would be funded by the operation of the Conco's business, which was to continue through December 31, 2018. The UCC supported the Third Amended Plan because it would guarantee them a higher recovery than if Delfasco gained control of Conco.

On November 20, 2014 (the "Confirmation"), the Bankruptcy Court confirmed Conco's Third Amended Plan of Reorganization (the "Confirmed Plan") which provides Class 3 "(i) Defined Distributions – general unsecured claim holders approximately $4,848,391, which equates to approximately forty cents on the dollar for their claims; and (ii) Contingent Distributions representing each holder's pro rata share of fifty percent of Debtor's 'annual net operating profit before depreciation' over the amount projected by Debtor in the forecast years 2015 to 2018." Regarding the Equity Security Interests of the Debtor, the Confirmed Plan provides:

On the Effective Date, holders of equity securities in the Debtor shall retain their interests as in existence immediately prior to the Effective Date. Between Confirmation and the Effective Date, the ESOP shall be amended to provide that the Debtor may not contribute money or any other property to the ESOP, nor repurchase any employee-owned equity securities through December 31, 2018, to the extent allowed by applicable law.

Confirmed Plan, Art. V-Treatment of Claims and Interests, Class 4 – Equity Security Interests [Bankr. DN 468-1] 9. The Confirmed Plan contains no other statements regarding the Equity Security Interests. The Third Amended Disclosure Statement (the "Disclosure Statement"), in the "Classes of Claims and Interests" section, contains the identical language quoted above. [Bankr. DN 389] 16. December 31, 2018, is when the last Defined Distributions are scheduled to be made and the last Contingent Distributions will be calculated. After Confirmation, Delfasco made offers to the ESOP Trustees and the Conco board of directors to purchase all of the Equity Security Interests. These offers were not accepted.

On July 1, 2015, Appellant-Participants filed a complaint against Conco, the Board of Directors of Conco, Inc., the ESOP, and the Conco ESOP Trustees (the "ERISA Litigation"). Appellant- Participants asserted two claims, one for a declaration that the Conco ESOP Trustees have breached their fiduciary duties under ERISA by not evaluating and responding to offers by Delfasco to purchase the Equity Security Interests (Count I), and one for injunctive relief to remove the ESOP Trustees and name one or more independent trustees (Count II) (together, the "Complaint").

Following a motion to transfer and refer the ERISA Litigation to the Bankruptcy Court, the issue of whether Conco's Confirmed Plan prohibits the sale of the Equity Security Interests, to anyone, before December 31, 2018, was raised. During oral argument on October 19, 2015, Conco contended that an Equity Security Interests sale to Delfasco would violate the terms of the Confirmed Plan because Delfasco's intent would be to close Conco. Thereafter, an oversight committee, which was acting as successor in interest to the UCC (the "Oversight Committee"), had the bankruptcy case reopened and on November 6, 2015, filed a motion to enforce the Confirmed Plan by prohibiting the sale of the Class 4 Equity Security Interests through December 31, 2018 ("Motion to Enforce"). On November 18, 2015, the ESOP Trustees filed a motion seeking clarification of the Confirmed Plan and a declaration of the rights therein

("Motion for Clarification"). Specifically, the ESOP Trustees sought "necessary guidance and a declaration from the Bankruptcy Court as to whether a sale of 100% of shares of ESOP-owned stock to Delfasco, or any third party, prior to completion of the Amended Plan in 2018, is consistent with and/or violates the Confirmation Order and Amended Plan." Def. ESOP-Trustes' Mot. For Clarification [Bankr. DN 516] 4. Delfasco filed an objection to both motions, Conco filed a response in support of the Motion to Enforce, and Appellant-Participants filed an objection and supplemental objection to the Motion to Enforce and the Motion for Clarification.

On February 18, 2016, the Bankruptcy Court ordered "that the holders of Class 4 Equity Security Interests of Conco, Inc. under the Debtor's Third Amended Plan of Reorganization are hereby enjoined from selling, transferring, or otherwise divesting themselves of the Equity Interests of Conco, Inc. until January 1, 2019" (the "February 18, 2016 Order"). Order [Bankr. DN 552.] The Bankruptcy Court found that the four corners of the Confirmed Plan, as well the UCC's abandonment of its objection under the absolute priority rule of 11 U.S.C. § 1129(b)[1] to the ESOP's retention of the Equity Interest in Conco, evidenced an intent for the Equity Interests not to be sold through December 31, 2018. The Appellants filed a timely appeal to the District Court which affirmed the Bankruptcy Court's decision on July 7, 2016. The Appellants filed a timely appeal to this court on July 21, 2016.

II.

The district court has original and exclusive jurisdiction over a bankruptcy case under 28 U.S.C. § 1334(a). The bankruptcy court, as a unit of the district court pursuant to 28 U.S.C. § 151, and by a standing order of reference from the district court, has jurisdiction to hear core proceedings, as defined in 28 U.S.C. § 157(b), arising in the bankruptcy case. The District Court had jurisdiction to hear the appeal of the February 18, 2016 Order under 28 U.S.C. § 158(a). This court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(d).

---

[1]The absolute priority rule is set forth in 11 U.S.C. § 1129(b)(2)(B), which provides that, if a dissenting class of holders of unsecured claims is not paid in full, "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property…." If the unsecured creditor class votes to reject a plan, holders of equity cannot ever receive anything under the plan unless the dissenting class is paid in full. Equity holders would have their shares cancelled. *See, e.g., Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 437 (1999).

This case involves the further appeal of the Bankruptcy Court's Opinion. Therefore, this court will directly review the Bankruptcy Court's opinion rather than the District Court's opinion in the initial appeal. *See, e.g., McMillian v. LTV Steel, Inc.*, 555 F.3d 218, 225 (6th Cir. 2009) ("On appeal from a district court's judgment affirming an order of the bankruptcy court, this Court reviews the bankruptcy court's order directly, and gives no deference to the district court's decision."); *Brady-Morris v. Schilling* (*In re Knight Trust*), 303 F.3d 671, 676 (6th Cir. 2002) ("In a case which comes to us from the bankruptcy court by way of an appeal from a decision of a district court, we review directly the decision of the bankruptcy court. We accord no deference to the district court's decision.").

III.

"The standard of review on appeal is determined by the nature of the action taken below by the bankruptcy court." *In re Terex Corp.*, 984 F.2d 170, 172 (6th Cir. 1993); *see also In re Dow Corning, Corp.*, 456 F.3d 668, 674-75 (6th Cir. 2006). Where a bankruptcy court "modifies" a plan, the decision is subject to *de novo* review. *Dow Corning, Corp.*, 456 F.3d 668, 674-75. Where a bankruptcy court "applies" the Bankruptcy Code, its determinations are also subject to *de novo* review. *Id*. Where a bankruptcy court merely "interprets" an ambiguous plan under its equitable authority, the decision is reviewed for an abuse of discretion. *Id*. The parties differ on the standard of review to be applied in this case.

As this court found in *Dow Corning*, "[a]lthough the interpretation of an amended plan of reorganization is analogous in many respects to the construction of a contract, we remain mindful that the law of this circuit requires that we review a bankruptcy court's interpretation of its own decision with significant deference." *Id*. at 676 (citing *Terex Corp.*, 984 F.2d at 172). The Appellants nevertheless contend this court should apply a *de novo* standard of review because the Bankruptcy Court's ruling constitutes modification of the Confirmed Plan and/or a purely legal contractual analysis.

In order to determine whether a bankruptcy court's decision "merely interpreted a plan, as opposed to modifying it, 'we turn to the reasoning and language in the bankruptcy court's [February 18, 2016] order.'" *Dow Corning*, 456 F.3d at 675 (quoting *Terex*, 984 F.2d at 172).

The Bankruptcy Court reasoned that, "[t]he four corners of the document evidence the parties' intent and agreement for the ESOP holders and the Equity Interest holders to maintain their stock position until completion of the Amended Plan." RE 1, Page ID #13. The Bankruptcy Court went on to explain that, "the parties' intent is evident in the Amended Plan. That intent was for the equity interests to remain as they stood at confirmation until the Amended Plan is completed." RE 1, Page ID #14. The language of the Bankruptcy Court's decision makes it clear that it was only interpreting the Confirmed Plan, not modifying it. The Bankruptcy Court referenced the four corners of the Confirmed Plan to determine the parties' intent when drafting it. There was no language in the Bankruptcy Court's decision that indicated that it was attempting to modify the Confirmed Plan.

The Appellants further argue, however, that, although the language of the February 18, 2016 decision indicates that the Bankruptcy Court seemingly only interpreted the Confirmed Plan, the Bankruptcy Court essentially modified the Confirmed Plan under the guise of interpretation. The Appellants contend the Bankruptcy Court modified the Confirmed Plan because it added a term: that the Confirmed Plan also prohibited the sale of Equity Security Interests to third parties. This is simply untrue. The prohibition of the sale of Equity Security Interests was necessarily part of the Confirmed Plan when the Bankruptcy Court considered the parties' intent when drafting it.

Alternately, the Appellants contend that because, in interpreting the Confirmed Plan, the Bankruptcy Court did not exercise its equitable powers, the Bankruptcy Court's ruling constitutes a purely legal contractual analysis, and thus should be reviewed *de novo*. This argument is similar to the debtor-appellant's argument in *Terex* and is based on the premise that because the Bankruptcy Court referenced specific provisions of the Bankruptcy Code it was making a legal analysis as opposed to an equitable one. In *Terex*, the debtor-appellant argued that "because the bankruptcy court relied on specific provisions of the Bankruptcy Code in arriving at its decision, the standard of review should be de novo." *Terex*, 984 F.2d at 172. However, this court:

> conclude[d] that although the bankruptcy court referred to explicit provisions of the Bankruptcy Code, it did not rely on or interpret the Bankruptcy Code. Its ruling, therefore, cannot be said to constitute a legal conclusion subject to *de novo*

review.  Rather we believe that the bankruptcy court interpreted the Plan, and then exercised its equitable powers to breath[e] life into the provisions of the Plan. Accordingly we review the interpretation of the Plan with full deference and we review the bankruptcy court's exercise of its equitable powers under an abuse of discretion standard.

*Id*. at 172 (citations omitted).

Similarly, the Bankruptcy Court's reasoning here makes it clear that it was exercising its equitable powers to breathe life into the provisions of the Confirmed Plan and was not relying on or interpreting the Bankruptcy Code, even though the Bankruptcy Court referenced the absolute priority rule.  The Bankruptcy Court explained, "[a]s Delfasco is Debtor's direct competitor, the purchase of the Equity Interests gives it an opportunity and incentive to impair the Debtor's reorganization."  Mem. Op. [Bankr. DN 552] 10.  The Bankruptcy Court further reasoned that:

[i]f Delfasco is allowed to defeat the Amended Plan by either the purchase of the Equity Interests or to drain the estate and the ESOP's resources through protracted litigation, Delfasco will benefit to the detriment of the creditors and the Debtors, who will lose the benefit of the bargain that the parties fought so hard to achieve.

*Id*.

Similar to the court in *Terex*, the Bankruptcy Court here referenced a specific provision of the Bankruptcy Code, not to conduct a legal analysis but to exercise its equitable powers in interpreting the Confirmed Plan.  Since the UCC was entitled to object to the Confirmed Plan under the absolute priority rule, the UCC's abandonment of that objection evidences the parties' intent for the equity interests to remain as they stood at Confirmation until the Confirmed Plan was complete.  Therefore, the Bankruptcy Court was not referencing the absolute priority rule of 11 U.S.C. § 1129(b) to make a legal determination, but referenced the specific provision of the Bankruptcy Code as evidence of the Confirmed Plan's intent.  This court has consistently held that these types of decisions by bankruptcy courts are contract interpretations, and thus are reviewed for an abuse of discretion.  This court is bound by its own precedent.  Therefore, the proper standard of review is for an abuse of discretion.

IV.

Section 1142(b) of the Bankruptcy Code authorizes bankruptcy courts to enforce § 1141 of the Bankruptcy Code by providing that "[t]he court may direct the debtor and any other necessary party . . . to perform any other act . . . that is necessary for the consummation of the plan." 11 U.S.C. § 1142 (b). Bankruptcy courts also have the power to interpret the orders that they have previously given. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 146 (2009). In this circuit, a confirmed plan is considered to be an order of the bankruptcy court; the bankruptcy court has the power to interpret such a plan. *See Terex*, 984 F.2d at 172; *Dow Corning*, 456 F.3d at 675-76. "In interpreting a confirmed plan, courts use contract principles, since the plan is effectively a new contract between the debtor and its creditors." *Dow Corning*, 456 F.3d at 676; 11 U.S.C. § 1141(a). "State law governs those interpretations," *id*. at 676, and, under Kentucky law, the primary objective in construing a contract is to effectuate the intent of the parties. *3D Enters. Contracting Corp. v. Louisville & Jefferson Cty. Metro. Sewer Dist.*, 174 S.W.3d 440, 448 (Ky. 2005) citing *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. Ct. App. 2002). "Any contract or agreement must be construed as a whole, giving effect to all parts and every word in it if possible." *Cantrell Supply*, 94 S.W.3d at 384-85 (quoting *City of Louisa v. Newland*, 705 S.W.2d 916, 919 (Ky. 1986)).

Absent an ambiguity in the contract, the parties' intentions must be discerned from the four corners of the instrument without resort to extrinsic evidence. *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky. 2000). "Where a contract is ambiguous or silent on a vital matter, a court may consider parol and extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties." *Cantrell Supply*, 94 S.W.3d at 385; *see Ranier v. Mount Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991) (quoting *Caudill v. City of Maysville*, 178 S.W.2d 945, 946 (Ky. 1944)) ("When a contract is silent with respect to a matter vital to the rights of the parties, a court, in construing it, is necessarily compelled to resort to a consideration of the surrounding circumstances and the conduct of the participants indicating their interpretations."); *Bank of New York v. Janowick*, 470 F.3d 264, 270–71 (6th Cir. 2006) (same). "A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent

interpretations." *Cantrell Supply*, 94 S.W.3d at 385. "The fact that one party may have intended different results, however, is insufficient to construe a contract at variance with its plain and unambiguous terms." *Id*. "Although the interpretation of an amended plan of reorganization is analogous in many respects to the construction of a contract, we remain mindful that the law of this circuit requires that we review a bankruptcy court's interpretation of its own decisions with significant deference." *Dow Corning*, 456 F.3d at 676 (citing *Terex*, 984 F.2d at 172).

The Appellants contend that the plain and unambiguous terms of the Confirmed Plan prohibit only Conco from purchasing the Equity Security Interests, but provide no restriction on the right of the ESOP to sell the Equity Security Interests to a third party. The relevant portion of the Confirmed Plan that discusses the sale of Equity Security Interests reads as follows:

> Between Confirmation and the Effective Date, the ESOP shall be amended to provide that the Debtor may not contribute money or any other property to the ESOP, nor repurchase any employee-owned equity securities through December 31, 2018, to the extent allowed by applicable law.

The Bankruptcy Court found that this section of the Confirmed Plan's language regarding the Equity Security Interests was unambiguous. *District Court Opinion*, RE 44, Page ID #932 ("The only reference to ambiguity is when the Bankruptcy Court stated '[w]hen no ambiguity exists, the Court need only look as far as the four corners of the document to determine the parties' intent.'"). However, the Bankruptcy Court went on to explain that the UCC's abandonment of the absolute priority rule objection evidences the parties' intent for the equity interests to remain as they stood at Confirmation until the Confirmed Plan was complete, and ultimately concluded that the Confirmed Plan restricted the sale of the Equity Security Interests to Delfasco through December 31, 2018. *Id*. at Page ID #933.

The two sentences that restrict the sale of Equity Security Interests do not appear to be unambiguous as the Bankruptcy Court suggests. The Confirmed Plan clearly prevents the sale of Equity Security Interests to the Debtor, but is either silent or ambiguous as to whether the Equity Security Interests can be sold to a third party. Therefore, under Kentucky contract law, which governs the Confirmed Plan, "if a contract is silent on a certain point, the law will imply an obligation to carry out the purpose for which the contract was made." *Old Republic Ins. Co. v.*

*Ashley*, 722 S.W.2d 55, 58 (Ky. Ct. App. 1986) (citing *Warfield Nat. Gas Co. v. Allen*, 59 S.W.2d 534 (Ky. 1933)).

The text of the Confirmed Plan is silent on whether equity sales to third parties are permitted. Conco itself is the only expressly forbidden buyer. But the failure to mention other equity restrictions does not prove that all other equity sales are permitted. Silence, here, is simply silence. And the surrounding context shows that the intent of the parties, and the purpose of the Confirmed Plan, cannot accommodate any sales of equity until the Confirmed Plan term expires.

Numerous provisions in the Confirmed Plan show that the parties and the Bankruptcy Court intended the business to run with the same owners and management through the end of 2018. To start, there are the provisions giving defined and contingent, profit-based payments to creditors through December 31, 2018. Bankr. DN 468-1 at 9. The expected contingent payments were based on forecasts about how the company would run from 2015–2018. *Id.* at 13–15. And the "Post-Confirmation Operations" provision reinforces this expectation. It states that "operations will be directed and managed by Gilbert Everson, who has served as the Debtor's CEO since prior to the Petition Date," that Conco "will retain all property of its estate and continue to use it in the operation of its manufacturing business," and that based on "[]the Forecast[], the Debtor expects its post-Confirmation operations will generate revenues sufficient to satisfy and discharge . . . Claims treated in the Plan." *Id.* at 12. All of this points to an expectation that ownership and operations would remain stable through the Confirmed Plan term. Further confirming the point is that the Confirmed Plan runs for only three years, from 2015 through 2018. That short life-span both explains the Confirmed Plan's silence as to changes in ownership—no one expected a good offer in that time frame—and shows that the parties did not intend to allow a change in ownership while the Confirmed Plan was running.

Oral argument cleared up one final doubt. We asked whether the Confirmed Plan would really prohibit even an overwhelmingly generous purchase offer—one that would be favorable to creditors and shareholders alike. The Appellees conceded that even such a desirable sale would be prohibited under the Confirmed Plan. If a perfect offer was made, they said, the creditors, debtor, and shareholders would all have to agree and then go back to get the Bankruptcy Court's

approval of a new, prepackaged replacement plan.  We agree.  For these reasons, though the text is silent on third party equity purchases, the best reading of the Confirmed Plan is that it envisions the same owners, managers, and operations through the end of 2018.

The Bankruptcy Court incorrectly concluded that the Confirmed Plan language was unambiguous as to whether the sale of the Equity Security Interests can be sold to third parties. Nevertheless, the Bankruptcy Court properly relied on its understanding of the two years of plan negotiations that led to the Confirmed Plan to determine that the intent of the parties was to prohibit the sale of Equity Security Interests to Delfasco so that Conco could remain as a going concern during the administration of the Confirmed Plan.  It is important to note that the sale of the Equity Security Interests to Delfasco is only prohibited through December 31, 2018, when the Confirmed Plan is fully administered.  After that date, Delfasco is no longer prohibited from purchasing the Equity Security Interests.  The Bankruptcy Court noted that if Delfasco was allowed to purchase the Equity Security Interests during the administration of the estate, Conco's largest customers would cease doing business with it and the unsecured creditors would potentially not get paid if Conco was closed.  Since "a bankruptcy court's interpretation of its own confirmation order is entitled to substantial deference," *Travelers Indem. Co.*, 557 U.S. at 151 n.4 (2000) (compiling cases from the First, Second, Third Fourth, Fifth, Sixth, Seventh, Eighth, and Eleventh Circuits), the Bankruptcy Court did not abuse its discretion when it found that the Confirmed Plan restricted the sale of Equity Security Interests through December 31, 2018.

V.

Section 1125 of the Bankruptcy Code provides that approval of a chapter 11 plan may not be solicited unless "at the time of or before such solicitation, there is transmitted to such holder [of a claim or interest] the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b).  While the Bankruptcy Code does not precisely define "adequate disclosure", the disclosure statement must contain enough information to comport with the purpose of requiring a disclosure statement.  11 U.S.C. 1125(a)(1) defines "adequate information" as:

information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records. . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan. . . and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.

"The purpose of the disclosure provisions of Chapter 11 is to provide holders of claims and interests with 'adequate information' prior to the acceptance or rejection of a reorganization plan, in order for them to be able to make an informed judgment as to the feasibility of the plan." *In re Microwave Prod. of Am., Inc.*, 100 B.R. 376, 377 (Bankr. W.D. Tenn. 1989).

There is no dispute that the Disclosure Statement contains the same terms as the Confirmed Plan. Appellants instead contend that because the Disclosure Statement contains the same terms as the Confirmed Plan, which does not explicitly prohibit the sale of Equity Security Interests to third parties, the Disclosure Statement shows that there are no restrictions on the ability to sell stock.

However, the purpose of the disclosure statement requirements is to ensure that holders of claims and interests have adequate information about the Confirmed Plan prior to acceptance or rejection of it. Put simply, if the Confirmed Plan sets forth the terms of the bargain struck by the parties, and the Disclosure Statement mimics those same terms, then the Disclosure Statement necessarily disclosed the bargain. Therefore, the Bankruptcy Court did not abuse its discretion when it found that the Disclosure Statement did not show the absence of a restriction on third party sales.

## VI.

Appellants have not met "the extremely difficult burden of demonstrating on appeal that the bankruptcy court incorrectly interpreted its own prior language or intent." *Dow Corning*, 456 F.3d at 677; *see Terex*, 984 F.2d at 172; *see In re Settlement Facility Dow Corning Trust*, 628 F.3d 769, 772 (6th Cir. 2010) (deference due where "[t]here is simply no denying that [the lower court judge] is much more familiar with this Plan—and with the parties' expectations

regarding it—than we are"). Accordingly, the Bankruptcy Court did not abuse its discretion when interpreting the Confirmed Plan and enjoined the sale of the Equity Security Interests through December 31, 2018. For the foregoing reasons, we **AFFIRM** the Bankruptcy Court's decision.