**NOT RECOMMENDED FOR PUBLICATION**

File Name: 20a0265n.06

Case No. 19-6200

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
May 11, 2020
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| CARL FREDERICK COSLOW, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF KENTUCKY |
| WILLIAM STEPHEN REISZ, | ) | |
| | ) | |
| Defendant-Appellant. | ) | **O P I N I O N** |

---

**BEFORE: MOORE, McKEAGUE, and READLER, Circuit Judges.**

**McKEAGUE, Circuit Judge.** William Reisz, a bankruptcy trustee, appeals the order of the district court affirming the order of the bankruptcy court, which itself denied summary judgment to the trustee, granted summary judgment to debtor, Carl Coslow, and ordered the trustee to abandon Coslow's residence. For the reasons stated herein, we **REVERSE** and grant judgment in favor of the trustee.

**I**

In June 2014, Carl Coslow was in serious financial trouble. For years he had successfully run his own company, Republic Industries International, Inc. ("Republic"). But after a downturn in business, Republic was struggling to pay off the $4.5 million in loans it had taken out from Stock Yards Bank ("Stock Yards"). Coslow also faced significant personal risk, since he had

personally guaranteed the loans. At risk of defaulting on the loans, Coslow decided to liquidate Republic.

As part of this process, in November 2014, Republic sold its Highwall Mining Division to JBLCO, LLC ("JBL") pursuant to an Asset Purchase Agreement (APA). JBL didn't pay the purchase price in a lump sum; per the APA, JBL was obligated to pay off the price in installments over several years. Republic assigned its right to JBL's future payments directly to Stock Yards.

By December 2015, Republic had liquidated all of its assets that were worth anything. But it still owed Stock Yards over $1 million. At that point, Coslow and Stock Yards made a deal. Stock Yards decreased the amount of Coslow's personal liability for his guarantees on Republic's loans to $425,000, the same amount owed by JBL under the APA. Coslow granted Stock Yards a mortgage on his residence in the amount of $275,000 to secure JBL's continued payments. And Coslow also promised to continue making efforts to "cause Republic to perform its covenants under the [APA]" with JBL and "to facilitate collection on behalf of Stock Yards from JBL." Joint Stipulation of Facts, R. 10, at 3.

On July 26, 2016, Coslow filed for bankruptcy under Chapter 7. He and his wife owned their residence as joint tenants with rights of survivorship, and had a traditional mortgage on their house, which at that point had a balance of approximately $62,500. Coslow also had his second mortgage with a balance of $275,000. Although JBL had been paying Stock Yards, at that point, it had not paid down its obligation below $275,000, the amount of Coslow's second mortgage. So it had not decreased the amount of Stock Yards's mortgage as of Coslow's bankruptcy petition. But JBL was on track to pay off its obligation entirely and thus Coslow's second mortgage by May 2017.

On December 30, 2016, Coslow filed a complaint in the bankruptcy court alleging that since his residence was fully encumbered on the day of his bankruptcy petition, it was of inconsequential value and benefit to the estate and should be abandoned by the trustee under 11 U.S.C. § 554(b). Coslow sought a declaratory judgment to that effect and an order compelling the trustee to abandon the property. The trustee filed an answer and counterclaim on January 30, 2017. The trustee argued that the court should consider the equity created post-petition by JBL's continued monthly payments to Stock Yards.

The bankruptcy court granted Coslow's motion for summary judgment and issued an order compelling the trustee to abandon the residence. The bankruptcy court found that the value of the residence should be determined as of the day of Coslow's petition for bankruptcy. Because Coslow had no equity on that day, the residence was of inconsequential value and benefit to the estate. Thus, the bankruptcy court held that the property should be abandoned. The court also found that any equity in the house that accrued as a result of JBL's payments was payment for Coslow's post-petition labor. And so it could not become property of the bankruptcy estate. The trustee appealed, and the district court affirmed the bankruptcy court's order. The trustee then brought this appeal.

**II**

When an appellant challenges a district court's order affirming an order of the bankruptcy court, "this court will directly review the Bankruptcy Court's opinion rather than the District Court's opinion in the initial appeal." *In re Conco, Inc.*, 855 F.3d 703, 709 (6th Cir. 2017). And when we directly review a bankruptcy court's decision on a motion for summary judgment, "we review the bankruptcy court's factual findings for clear error and its legal conclusions *de novo*." *In re Wells*, 561 F.3d 633, 634 (6th Cir. 2009) (citing *In re Cannon*, 277 F.3d 838, 849 (6th Cir. 2002)).

Summary judgment is appropriate when there is no dispute of material fact, so that the case can be decided as a matter of law. Fed. R. Civ. P. 56(a). There is no dispute of material fact in this case, as is evidenced by the parties' joint submission of a stipulated record. So the question is: which party's motion for summary judgment should be granted? Which party is entitled to judgment as a matter of law? The bankruptcy court found that Coslow was entitled to summary judgment. We disagree.

The first question is what exactly became property of the estate. The house is easy. Coslow had a "legal or equitable interest" in his property "as of the commencement of the case." 11 U.S.C. § 541(a)(1). And so his home became property of the estate when Coslow filed for bankruptcy.

The harder question is whether the equity that accrued in Coslow's residence after his bankruptcy petition became property of the estate. After all, Coslow's equity increased because of payments made by JBL *after* Coslow's bankruptcy petition; the relevant payments hadn't yet been made "as of the commencement of the case." The bankruptcy code holds the answer to this question; it says that the bankruptcy estate acquires all "[p]roceeds, product, offspring, rents, or profits of or from property of the estate, *except* such as are earnings from services performed by an individual debtor after the commencement of the case." 11 U.S.C. § 541(a)(6) (emphasis added). So, in general, post-petition increases in equity do become part of the bankruptcy estate, as long as the equity isn't payment for post-petition services. *Wilson v. Rigby*, 909 F.3d 306, 309 (9th Cir. 2018); *In re Celentano*, No. 10-22833 (NLW), 2012 WL 3867335, at *5 (Bankr. D.N.J. Sept. 6, 2012).

The bankruptcy court found that JBL's payments under the APA, and the resulting increases in Coslow's equity in his residence, were compensation for Coslow's post-petition services. Thus, it held that the equity accrued in Coslow's residence after his bankruptcy petition

did not become part of the bankruptcy estate. The bankruptcy court's finding that Coslow performed post-petition work is a factual finding, so we review it only for clear error. *See In re Wells*, 561 F.3d at 634. "A factual finding is clearly erroneous when, though there is evidence to support that finding, 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Mack*, 159 F.3d 208, 215 (6th Cir. 1998) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

This is one of those rare cases where we are left with the firm conviction that the bankruptcy court was mistaken. For one thing, Coslow does not even claim that he performed post-petition labor in order to earn JBL's payments. His brief on appeal doesn't assert that JBL was paying him for any post-petition work. His brief in the district court didn't claim he did post-petition work. And his complaint in the bankruptcy court didn't allege that he did post-petition work.

But even if we overlook the fact that Coslow himself does not purport to have performed post-petition work, there is also the problem of a lack of evidence to support the bankruptcy court's factual finding. It was Coslow's burden to make the initial showing that he performed post-petition services. *See In re Thomas*, 516 F. App'x 875, 878 (11th Cir. 2013); *In re Walhof Props., LLC*, No. 8:18-BK-05531-MGW, 2020 WL 1645968, at *3 (Bankr. M.D. Fla. Mar. 30, 2020). He did not make that showing. Yes, the parties stipulated that Coslow signed an agreement with Stock Yards that said he would make "continued efforts to cause Republic to perform its covenants under the [APA]" and make "efforts to facilitate collection on behalf of Stock Yards from JBL." Joint Stipulation of Facts, R. 10, at 3. But that agreement doesn't indicate that Republic actually had any covenants that it still had to perform under the APA or that Coslow actually had to do anything to facilitate JBL's payments. *See Longaker v. Bos. Sci. Corp.*, 715 F.3d 658, 662 (8th Cir. 2013)

("Courts construe § 541(a)(6)'s earning exception narrowly and apply it only to payments a debtor receives post-petition if the money is attributable to post-petition services actually rendered by the debtor.") (citing *In re Stinnett*, 465 F.3d 309, 313 (7th Cir. 2006)).  Further, even if Coslow did have to do some work after his agreement with Stock Yards to ensure JBL's payments, we don't have any evidence of whether Coslow performed any of that work after his bankruptcy petition. And any payments received post-petition for "services performed prior to bankruptcy are includable within the bankruptcy estate." *In re Ryerson*, 739 F.2d 1423, 1426 (9th Cir. 1984); *see also In re Soboslai*, 263 B.R. 700, 703 (Bankr. D. Conn. 2001) (finding that the portion of a bonus was to be included in the bankruptcy estate in a prorated amount equal to the portion of the bonus attributable to pre-petition services).  The language in the agreement between Coslow and Stock Yards is insufficient standing on its own to support the bankruptcy court's finding that Coslow actually performed services and that he did so after filing for bankruptcy.  Because the post-petition equity increase in Coslow's residence was not compensation for post-petition services, we conclude that the equity did become property of the estate.

Having determined that the house and any associated equity appreciation were property of the bankruptcy estate, the second question is whether the bankruptcy court should have ordered the trustee to abandon that property.  Under 11 U.S.C. § 554(b), "the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  But "[a]n order compelling abandonment is the exception, not the rule.  Abandonment should only be compelled in order to help the creditors by assuring some benefit in the administration of each asset." *In re K.C. Mach. & Tool Co.*, 816 F.2d 238, 246 (6th Cir. 1987).

Coslow argues that the bankruptcy court was right to order the trustee to abandon Coslow's residence because he had no equity in the property at the time he filed for bankruptcy and so the residence held no value for the estate. He suggests that the court must ignore the fact that after he filed his bankruptcy petition, JBL continued paying down his mortgage every month, such that Coslow quickly gained equity in the house. This is because, according to Coslow, the snapshot rule applies, and the court must assess his equity in his house at the time of his bankruptcy petition and therefore ignore JBL's subsequent payments.

In our view, however, it makes little sense to apply the snapshot rule here. First, unlike determining what property becomes a part of the bankruptcy estate, which is measured at the time of filing, the abandonment section of the bankruptcy code says nothing about looking to the "commencement of the case" to determine value. *Compare* 11 U.S.C. § 541(a)(1), *with id.* § 554(b). In fact, the abandonment section uses the present tense when discussing abandonment of valueless property. *See id.* § 554(b) ("On request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that *is* burdensome to the estate or that *is* of inconsequential value and benefit to the estate." (emphasis added)).

Second, as best we can tell, every court confronted with an analogous abandonment dispute has looked to the equity contained in the debtor's property at the time the abandonment motion came before it, rather than at some static moment in the past. *See, e.g.*, *Celentano*, 2012 WL 3867335 at *4–6. (discussing issue and collecting cases). And for good reason, too, as the question of whether to abandon property is not limited to a simple equity calculation. Rather, as we explained in *In re K.C. Mach. & Tool Co.*, abandonment is a commonsensical inquiry, requiring courts to look beyond whether the property has "present *value* [for] the estate," and to consider also whether "administration of the property will *benefit* the estate," in any way. 816 F.2d at 245;

*accord* 11 U.S.C. § 554(b) ("[T]he court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value *and* benefit to the estate." (emphasis added)); *In re Paolella*, 79 B.R. 607, 610–11 (Bankr. E.D. Pa. 1987) (stating that the "party opposing abandonment might also establish some other form of value or benefit to the estate *which would accrue* to it by retention of the property" and "I am prepared to grant the debtors' requests to order abandonment in both cases unless some party comes forward to establish that one or both estates have equity in the properties at issue *or can show some other benefit to the estates emerging from continued administration* of these properties" (emphases added)).

Moreover, to the extent any bankruptcy courts have considered equity at the time of filing in the course of deciding an abandonment motion, *cf. Paolella* 79 B.R. at 610, there is no indication that those courts were applying the snapshot rule, much less that they were confronted with the "somewhat unusual" circumstances present here, *In re Coslow*, 573 B.R. 717, 722 (Bankr. W.D. Ky. 2017). That is, a circumstance where a third party had quickly paid down a debtor's mortgage during the pendency of the bankruptcy, such that a property that appeared to be without equity at filing was suddenly brimming with equity by the time the abandonment motion came before the court.[1] *See* Appellant Br. at 8 (noting that, by the time the abandonment motion came before the bankruptcy court in April 2017, Coslow's equity in his home was north of $200,000). Therefore, the bankruptcy court's decision to approve abandonment—based on nothing more than the snapshot rule and a simple equity calculation—was legal error.

In response, Coslow argues that a parade of horribles will follow from this conclusion, and that trustees will force bankruptcy courts to keep cases involving underwater properties open "for

---

[1]In the run of the mill individual Chapter 7 bankruptcy, by contrast, a debtor will *not* pay their mortgage during the pendency of the bankruptcy (because they are protected temporarily from foreclosure by the "bankruptcy stay" and because they are likely to lose their home once the bankruptcy concludes anyway).

years," just to collect the pot of equity at the end of the mortgage rainbow. Appellee Br. at 16. We are not convinced. Not only is this case factually distinct—most Chapter 7 filers do not have a third party paying off their mortgage during the pendency of their bankruptcy, thus making any parade, horrible or not, unlikely—but also, as the Bankruptcy Appellate Panel of the Ninth Circuit has noted, there is a simple solution to this fear: move for abandonment sooner, before accruing substantial equity in the property. *See In re Chappell*, 373 B.R. 73, 83 (9th Cir. BAP 2007) (observing that "[s]uch a motion would either [] force[] the trustee to sell before he might otherwise have preferred or allow[] the debtors to withdraw the property from the estate entirely as being 'of inconsequential value and benefit to the estate'").

## III

In sum, because Coslow's residence had value to the estate at the time the bankruptcy court considered Coslow's abandonment motion, and that value was not the result of post-petition services performed by Coslow, the bankruptcy court could not order the trustee to abandon the residence. We therefore reverse the bankruptcy court's order, and grant summary judgment in favor of the trustee.