RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0281p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

IN RE: LICKING RIVER MINING, LLC,

*Debtor.*

---

EAST COAST MINER LLC; EAST COAST MINER II LLC; KEITH GOGGIN; MICHAEL GOODWIN,

*Appellants,*

*v.*

NIXON PEABODY LLP; DELCOTTO LAW GROUP PLLC; GLASSRATNER ADVISORY & CAPITAL GROUP, LLC; JOHN J. BROGAN; FOLEY & LARDNER, LLP; BARBER LAW PLLC, THE JOHN T. BOYD COMPANY; SAMUEL K. CROCKER; PHAEDRA SPRADLIN,

*Appellees.*

No. 17-6310

On Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington;
Nos. 15-cv-54; 15-cv-65—Henry R. Wilhoit, Jr., District Judge.

United States Bankruptcy Court for the Eastern District of Kentucky at Ashland;
No. 14-bk-10201—Tracey N. Wise, Chief Judge.

Argued: October 16, 2018

Decided and Filed: December 28, 2018

Before: MERRITT, DAUGHTREY, and STRANCH, Circuit Judges.

---

## COUNSEL

**ARGUED:** John C Goodchild, III, MORGAN, LEWIS & BOCKIUS, LLP, Washington, D.C., for Appellants. Geoffrey S. Goodman, FOLEY & LARDNER LLP, Chicago, Illinois, for Appellees. **ON BRIEF:** John C Goodchild, III, MORGAN, LEWIS & BOCKIUS, LLP, Philadelphia, Pennsylvania, Bryan Killian, Stephanie Schuster, Washington, D.C., for

Appellants.  Geoffrey S. Goodman, FOLEY & LARDNER LLP, Chicago, Illinois, Laura Day DelCotto, DELCOTTO LAW GROUP PLLC, Lexington, Kentucky, Kent Barber, BARBER LAW PLLC, Lexington, Kentucky, Christopher M. Desiderio, NIXON PEABODY LLP, New York, New York, Stephen D. Lerner, Elliot M. Smith, SQUIRE PATTON BOGGS (US) LLP, Cincinnati, Ohio, for Appellees.

———————————

**OPINION**

———————————

MERRITT, Circuit Judge.  This appeal arises from the involuntary bankruptcy of U.S. Coal Corporation and its subsidiaries.  U.S. Coal is the parent of debtor Licking River Mining, a company that operated in eastern Kentucky.  The appellants are East Coast Miner LLC, East Coast Miner II LLC, Keith Goggin, and Michael Goodwin, generally referred to as the "Licking River Lenders."  The Lenders asserted a lien on substantially all of Licking River Mining's assets, including senior liens on all its cash collateral.  The appellees are the attorneys and other professionals hired by the debtor and the Official Committee of Unsecured Creditors to assist in the restructuring under Chapter 11.  After the bankruptcy proceeding was converted to Chapter 7, the professionals submitted a final fee application for approximately $2.5 million to be paid pursuant to the terms of an agreement previously entered into by the parties, including the Lenders.  The agreement contained a "Carve-Out," a contractual provision that allows the professionals to be paid ahead of secured creditors such as the Lenders.  The Lenders objected to payment of the fee from the Carve-Out.  Essentially, the Lenders contend that the Bankruptcy Code prohibits paying unsecured creditors such as the professionals from cash collateral secured by prepetition liens before paying secured creditors such as themselves, and that a proper interpretation of the Carve-Out does not provide to the contrary.  Because we find no merit to the Lenders' arguments, we affirm the bankruptcy court's decision.

**I.**

The bankruptcy proceeding was initiated under Chapter 11, allowing Licking River Mining to continue to operate with the goal of restructuring and returning to normal business operations.  Because the Lenders asserted liens on the debtors' assets, including cash collateral, the debtors could use the cash collateral only if either the Lenders consented to the use of such

cash collateral, or the bankruptcy court allowed the use of the cash collateral over the objections of the Lenders.  11 U.S.C. § 362(c).  As is common practice in Chapter 11 proceedings, the Lenders consented to the use of cash collateral for operating funds through a negotiated agreement with the debtors.  The culmination of the negotiations resulted in the "Final Cash Collateral Order," approved by the bankruptcy court on September 5, 2014.  To protect the prepetition liens on the cash collateral, the Lenders were granted superpriority claims and adequate protection liens to protect from diminution in the value of their collateral.  Final Cash Collateral Order at ¶¶ 11, 12.  The cash collateral order authorizes the debtors' use of cash collateral to fund the costs and expenses of administering the debtors' Chapter 11 case in accordance with approved budgets.  Final Cash Collateral Order ¶ 10.  As discussed further below, the order broadly defines "cash collateral."  Final Cash Collateral Order ¶ 7(k).

Attorneys and other professionals hired to assist in the reorganization generally require that the cash collateral agreement include a provision called a "carve-out" whereby the secured creditors "carve out" sums from cash collateral to ensure payment of certain fees and expenses. This provision limits the risk to the hired professionals by giving them priority to payment from cash collateral in the event of insolvency.  The cash collateral order in this case contains a "carve-out" provision.  Cash Collateral Order at ¶ 12(e).

The debtors realized in early 2015 that they would not be able to restructure the company. The Lenders filed a motion to terminate the debtors' use of cash collateral on February 23, 2015. On April 3, 2015, the bankruptcy court ordered amounts to be budgeted for professional fees in order for the professionals to complete the asset sales.  Despite concerns over administrative insolvency, the Lenders affirmed to the bankruptcy court at a hearing on April 10, 2015, their continued support of the debtors' pursuit of asset sales rather than an immediate conversion to Chapter 7.  This affirmation included agreement by Lenders' counsel that the cash collateral budgets would be modified to ensure that the professionals working on the asset sales during this period would be paid.

The case was converted to Chapter 7 on April 24, 2015, and the professionals filed their Final Fee Applications for approximately $2.5 million in May. The professionals requested payment of all unpaid fees pursuant to the Carve-Out. The Lenders objected to the professionals receiving any of the Final Fee Application payment from the Carve-Out, arguing that the sums comprising the Carve-Out did not extend to Lenders' prepetition liens and cash collateral, but instead sums for the Carve-Out could come only from postpetition liens now that the case had converted to a Chapter 7 bankruptcy. The bankruptcy court overruled the objections of the Lenders, finding that the text of the cash collateral order and the record in the case made it plain that the Carve-Out extended to Lenders' prepetition liens and that the professionals could be paid from cash collateral. *In re Licking River Mining, LLC,* No. 14-10201 (Bankr. E.D. Ky. July 24, 2015) (Order Overruling Procedural Objections of the Licking River Lenders to the Final Fee Applications of the Professionals Retained by Debtors and the Official Committee of Unsecured Creditors). The district court affirmed. *East Coast Miner LLC v. Nixon Peabody*, *LLP*, Nos. 15-cv-54 and 15-cv-65, 2017 WL 4393865 (E.D. Ky. Oct. 3, 2017).

## II.  Standard of Review

The district court reviewed the bankruptcy court's order as an initial matter. On appeal to our court, we directly review the bankruptcy court's opinion rather than the district court's opinion, and we give no deference to the district court's opinion. *See, e.g., McMillan v. LTV Steel, Inc.*, 555 F.3d 218, 225 (6th Cir. 2009) ("On appeal from a district court's judgment affirming an order of the bankruptcy court, this Court reviews the bankruptcy court's order directly, and gives no deference to the district court's decision.")

The parties dispute the standard of review we must apply to our review of the bankruptcy court's decision overruling the Lenders' objections to the Final Fee Application. The standard of review on appeal in a bankruptcy case "is determined by the nature of the action taken below by the bankruptcy court." *Terex Corp. v. Metro. Life Ins. Co. (In re Terex Corp.*), 984 F.2d 170, 172 (6th Cir. 1993); *see also In re Dow Corning Corp.*, 456 F.3d 668, 674-75 (6th Cir. 2006). If a bankruptcy court interprets its own prior orders and acts, review of the order is for a clear abuse of discretion. *Enodis Corp. v. Emp'rs Ins. of Wausau (In re Consol. Indus. Corp.)*, 360 F.3d 712,

716 (7th Cir. 2004). The Lenders argue that because the cash collateral order is "in the nature of" a negotiated contract, it should be reviewed *de novo* like any other contract.

This appeal presents a mixed question. The bankruptcy court interpreted the Final Cash Collateral Order in overruling the Lenders' objections to the Final Fee Application, and the interpretation of that order should be given deference. *See, e.g.*, *Harper v. The Oversight Comm. (In re Conoco, Inc.)*, 855 F.3d 703, 714 (6th Cir. 2017). To the extent the appeal involves review of the entire contract, including statutory construction of provisions of the Bankruptcy Code as applied to the contract, that review is *de novo*. Regardless of the level of review we accord the appeal, the decision of the bankruptcy court is affirmed.

## III.  Discussion

The crux of the Lenders' argument is that they never intended for funds allocated to the Carve-Out to come from their prepetition liens. Although the Lenders try to frame this as a statutory construction argument under the Bankruptcy Code, it is at bottom a contract dispute and normal contract-interpretation rules apply. The Lenders want to renegotiate the terms of the cash collateral order because payment of the $2.5 million in professional fees substantially impacts what they will recover under their already-diminished-in-value prepetition liens. But the record is clear that they agreed to hire the professionals, and they agreed for those professionals to keep working after the company became insolvent, presumably to benefit from the professionals' work in selling the assets of the company. They may not now unilaterally renegotiate the terms of the cash collateral order to avoid paying the professionals. The reasoning of the Lenders is not supported by the terms of the cash collateral order, the Lenders' conduct during the proceeding, or the case law. For the reasons below, their arguments are not well taken and are rejected.

### A.    Text of the Final Cash Collateral Order

The plain language of the Carve-Out provision says that the Carve-Out "shall mean . . . (iii) to the extent allowed *at any time*, . . . all fees, costs, and expenses (the "Professional Fees") incurred by persons or firms retained by the Debtors or the Creditors' Committee pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively the "Professional Persons") *at any*

*time* . . . . Final Cash Collateral Order at ¶ 12(e) (emphasis added).[1] The next question is, then, where do the sums come from to give effect to the Carve-Out? The Lenders argue that any property that came into the bankrupt estate after the conversion to Chapter 7—presumably including any cash from the sale of assets—cannot be part of the cash collateral used to pay the professionals pursuant to the Carve-Out and should instead be distributed according to normal priority rules, thereby giving the Lenders priority over the professionals. But nothing in the Carve-Out or the cash collateral order prevents this use of post-conversion cash collateral to pay the professionals, and indeed, as the bankruptcy court pointed out, to fail to include the sums collected from the sale of assets in making payments under the Carve-Out would render the Carve-Out meaningless in the case of a Chapter 7 conversion where the value of the prepetition collateral has been diminished. The Lenders contend that the bankruptcy court did not address this issue, and they seek only a remand so that the bankruptcy court can address whether new property that came into the estate after the conversion is subject to the Carve-Out. But the bankruptcy court did address the issue by overruling the Lenders' objections and explaining why their argument cannot stand.

---

[1]The Carve-Out provision states

The Carve-Out. For purposes hereof, the "Carve-Out" shall mean, with respect to the Debtors, collectively, the sum of (i) all fees required to be paid to the clerk of this Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (v) below); (ii) fees and expenses of up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (v) below); (iii) *to the extent allowed at any time, whether by interim order, procedural order or otherwise, all fees, costs, and expenses (the "Professional Fees") incurred by persons or firms retained by the Debtors or the Creditors' Committee* pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "Professional Persons") at any time before or on the first business day following delivery by the Pre-Petition Lenders of a Carve-Out Trigger Notice (as defined herein), whether allowed by this Court prior to or after delivery of a Carve-Out Trigger Notice (the "Pre-Trigger Date Fees"); and (iv) after the first business day following delivery by the Licking River Lenders of the Carve-Out Trigger Notice (the "Trigger Date"), to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of (x) all Professional Fees of Professional Persons retained by the Debtors; and (y) all Professional Fees of Professional Persons incurred by the Creditors' Committee, in an aggregate amount for clauses (x) and (y) not to exceed $500,000 incurred on and after the Trigger Date (the amount set forth in clauses (x) and (y) being the "Post-Carve Out Trigger Notice Cap"); provided that nothing herein shall be construed to impair the ability of any party to object to the reasonableness of the fees, expenses, reimbursement or compensation described in clauses (iii) and (iv) referred to above . . . .

Final Cash Collateral Order at ¶ 12(e) (emphasis added).

To drill down a bit into the Lenders' argument, they contend that the Carve-Out provision is to be funded only from "adequate protection liens" not from "prepetition liens." Their position is that Paragraph 12, which includes the Carve-Out provision, says that the Carve-Out funds can come only from the adequate protection liens, which would not include the property that came into the estate after the conversion and on which they have priority liens. But the opening language of Paragraph 12, on which the Lenders rely, specifically states that the Lenders' "claims, liens, rights, and benefits" set forth in Paragraph 12, which would include the prepetition liens, are "subject and subordinate to the Carve-Out and payment in full of the obligations benefitting from the Carve-Out . . . ." Cash Collateral Order ¶ 12.

Despite this language, the Lenders argue that the Carve-Out simply defines certain payment obligations but does not provide how to fund those payments, and that the bankruptcy court incorrectly interpreted how the parties intended to fund the Carve-Out. The Lenders are now attempting to modify what sources they agreed would fund the Carve-Out if the bankruptcy converted to Chapter 7. In Chapter 11 bankruptcy cases, the posture in which this case began, a secured creditor asserts a lien on the assets of a debtor's estate. A carve-out provision is necessary and generally included in the parties' negotiations to provide assurance to hired bankruptcy professionals that they will be paid if the debtor liquidates after they have incurred fees and expenses. *See, e.g., In re Nuclear Imaging Sys., Inc.*, 270 B.R. 365, 370 n.3 (Bankr. E.D. Pa. 2001). A carve-out serves in effect to give a higher-priority security interest to the professionals over the secured creditors. Notably, the bankruptcy laws specifically give high priority to administrative expenses in bankruptcy proceedings, such as attorney fees. *See* 11 U.S.C. § 1129(a)(9). Without a carve-out from prepetition secured liens, a secured creditor with a blanket lien over all the debtors' assets can prevent professionals who assisted in the bankruptcy from being paid, which is what the Lenders are attempting to do here. Furthermore, courts routinely enforce carve-out provisions in Chapter 7 cases. Even if a case is converted to Chapter 7, "the carve-out funds pursuant to court order, are earmarked for the exclusive benefit of the court-appointed chapter 11 professionals." *In re U.S. Flow Corp.*, 332 B.R. 792, 798 (Bankr. W.D. Mich. 2005); *see also In re Robotic Vision Sys., Inc.*, 367 B.R. 232, 234-40 (B.A.P. 1st Cir. 2007).

The bankruptcy court's interpretation of the cash collateral order's Carve-Out provision in this case is supported by other provisions in the order as well. Courts generally construe cash collateral orders like the one here according to general contract principles, which means looking at the entire document as part of an integrated whole, rather than looking at each provision in isolation. *See In re Dow Corning Corp.*, 456 F.3d at 676; *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 654 (6th Cir. 1996). Rather than looking at the cash collateral order as a whole, the Lenders ignore certain language in the order. First, the definition of cash collateral specifically references prepetition collateral:

> [A]ny and all of the Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, including any debt reserve accounts, any amounts generated by the collection of accounts receivable, the exercise of letter of credit rights, the sale of inventory, or other disposition of the ECM Prepetition Collateral, the ECM II Prepetition Collateral, the Groggin Prepetition Collateral, and the Goodwin Prepetition Collateral existing as of the Relief Dates, the proceeds of any of the foregoing *and the ECM Prepetition Collateral, the ECM II Prepetition Collateral, the Groggin Prepetition Collateral, and the Goodwin Prepetition Collateral is the Licking River Lenders' cash collateral within the meaning of section 363(a) of the Bankruptcy Code* (the "Cash Collateral")[.]

Final Cash Collateral Order at ¶ 7(k) (emphasis added). The cash collateral order also specifically provides that the terms of the order survive a conversion from Chapter 11 to Chapter 7:

> Except as expressly provided in this Final Order, the Adequate Protection Obligations, the Superpriority Claim, and all other rights and remedies of the Licking River Lenders granted by the provisions of this Final Order shall survive, and shall not be modified, impaired or discharged by the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of the Chapter 11 cases. The terms and provisions of this Final Order shall continue in the Chapter 11 Cases, in any successor cases if the Chapter 11 Cases cease to be jointly administered, *or in any superseding chapter 7 cases under the Bankruptcy Code* . . . ."

Final Cash Collateral Order ¶ 20(c) (emphasis added). If Carve-Out payments could be made to the professionals during the Chapter 11 proceeding, which the Lenders did not,

and do not now, dispute, the same provision continues to apply after conversion to Chapter 7.

**B.      Other Conduct by the Lenders Supporting Use of the Carve-Out to Pay Professionals**

The Lenders also represented to the bankruptcy court on at least two occasions that they intended for their prepetition liens to fund the Carve-Out even in the event of insolvency. On February 17, 2015, after it had been decided that the debtors could not restructure under Chapter 11, but before the case had been converted to Chapter 7 bankruptcy, the Lenders submitted a request for a "credit bid" on the assets of the debtors, where they stated:

> Pursuant to the Final Cash Collateral Order, the Licking River Lenders consented to the Debtors' use of their collateral to fund costs and expenses of administering the Debtors' chapter 11 cases, including, without limitation, a carve-out for the fees of professional firms retained by Debtors and the Committee . . .

Credit Bid at 7 (emphasis added). Two months later, at an April 10, 2015, hearing, despite concerns over insolvency, the Lenders specifically reaffirmed to the bankruptcy court the use of cash collateral to pay professional fees so that the professionals could continue to work on the sale of assets. Further sales did indeed continue with the assistance of the professionals until the case was converted to Chapter 7 on April 24, 2015. Despite their protestations now, the Lenders' conduct throughout the proceeding affirms that they intended their prepetition liens to be used to fund the Carve-Out.

**C.      The Bankruptcy Code**

The Lenders contend that their objection to the professional fees also arises under the language of the Bankruptcy Code, which requires "adequate protection" for the creditors after conversion to Chapter 7. 11 U.S.C. § 363(b), (c).[2] They argue that under this provision, neither the bankruptcy court by judicial fiat, nor the parties by contract, can reallocate assets from secured creditors to unsecured creditors, such as the professionals. Their argument seems to be

---

[2]Despite some of the arguments in their briefs, the Lenders seemed to acknowledge at oral argument that the Bankruptcy Code does not prohibit the Lenders from negotiating the terms of the Carve-Out. They now contend that they are only addressing the bankruptcy court's interpretation of the language in the Carve-Out provision.

that once the debtor company was no longer "operating," the Lenders' consent for the debtors to use cash collateral terminated automatically under Section 363.[3]  Under this theory, the Lenders were entitled to *new* "adequate protection" for their secured interests under the Code before unsecured creditors such as the professionals could be paid.  The Lenders' premise is that the funds "carved out" by a secured creditor from the proceeds of its collateral become estate property in the event of a conversion to Chapter 7.  As estate property, the funds must be distributed in accordance with the provisions of the Bankruptcy Code.  The Lenders' argue that the Carve-Out, as interpreted by the bankruptcy court, conflicts with the spirit of the Code's distribution scheme, under which priority creditors always get paid in full before general, unsecured creditors receive anything.  However, this theory goes beyond anything appearing expressly or by implication in the Code.  The Code provisions governing priorities of creditors apply only to distributions of property of the estate.  The Code does not govern the rights of creditors to transfer or receive nonestate property.  "While the debtor and the trustee are not allowed to pay nonpriority creditors ahead of priority creditors . . . creditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including to share them with other creditors."  *See In re Nuclear Imaging Sys., Inc.*, 270 B.R. at 377 (quoting *Official Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.)*, 984 F.2d 1305, 1312 (1st Cir. 1993)).  Nothing in the Code prohibits the Lenders from agreeing to use their collateral to pay the professionals.

The bankruptcy court found the Lenders' interpretation of the Carve-Out to "yield[] an illusory and absurd result."  Order Overruling Procedural Objections at 9.  As the bankruptcy court observed, under this reading "how could there ever be a recovery for professionals from a carve-out?"  *Id.*  The answer is, as the court noted, never—because the postpetition liens cannot have value if the superior prepetition liens have diminished in value.  We affirm the decision of the bankruptcy court.

---

[3]11 U.S.C. § 363(c) states in relevant part:

> (1) If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing . . . .