*By order of the Bankruptcy Appellate Panel, the precedential effect
of this decision is limited to the case and parties pursuant to
6th Cir. BAP LBR 8024-1(b). See also 6th Cir. BAP LBR 8014-1(c).*

*File Name: 20b0002n.06*

# BANKRUPTCY APPELLATE PANEL

## OF THE SIXTH CIRCUIT

---

In re: CHIEFTAIN STEEL, LLC, aka The Pennyrile Company, LLC; FLOYD INDUSTRIES, LLC, aka The Pennyrile Company, LLC,

> *Debtors.*

---

DINSMORE & SHOHL LLP; BINGHAM GREENEBAUM DOLL LLP; FOX ROTHSCHILD LLP; PHOENIX MANAGEMENT SERVICES LLC,

> *Appellants,*

> *v.*

UNITED CUMBERLAND BANK,

> *Appellee.*

No. 19-8005

---

Appeal from the United States Bankruptcy Court
for the Western District of Kentucky at Bowling Green.
No. 1:16-bk-10407—Joan A. Lloyd, Judge.

Argued: February 11, 2020

Decided and Filed: April 8, 2020

Before: DALES, MASHBURN, and PRICE SMITH, Bankruptcy Appellate Panel Judges.

---

## COUNSEL

**ARGUED:** Ellen Arvin Kennedy, DINSMORE & SHOHL LLP, Lexington, Kentucky, for Appellant Dinsmore & Shohl. Kyle W. Miller, BINGHAM GREENEBAUM DOLL LLP, Louisville, Kentucky, for Appellants Bingham Greenebaum Doll, Fox Rothschild, and Phoenix Management. Scott A. Bachert, KERRICK BACHERT, Bowling Green, Kentucky, for Appellee. **ON BRIEF:** Ellen Arvin Kennedy, DINSMORE & SHOHL LLP, Lexington, Kentucky, for Appellant Dinsmore & Shohl. Kyle W. Miller, BINGHAM GREENEBAUM

DOLL LLP, Louisville, Kentucky, for Appellants Bingham Greenebaum Doll, Fox Rothschild, and Phoenix Management. Scott A. Bachert, KERRICK BACHERT, Bowling Green, Kentucky, for Appellee.

———————————

## OPINION

———————————

RANDAL S. MASHBURN, Bankruptcy Appellate Panel Judge. Appellants, who were Professionals[1] working for the Debtor and Official Committee of Unsecured Creditors, faced a shortfall of more than $400,000 in getting their pre-confirmation fees paid when an involuntary Chapter 7 petition was filed against the Reorganized Chapter 11 Debtor. The Professionals asked the bankruptcy court to rectify the situation by making the secured lender responsible for the fees based on provisions of a series of cash collateral orders. The bankruptcy court declined to find that any such obligation existed under the plain language of the prior orders or the confirmed Chapter 11 plan. The bankruptcy court correctly rejected the Professionals' strained interpretation of the pertinent documents. We affirm.

### ISSUES ON APPEAL

The issue on appeal is whether United Cumberland Bank ("UCB") is liable for the allowed Professionals' fees pursuant to the terms of the Carve-Out contained in the cash collateral orders and the amended plan of reorganization, and if so, should be required to turn over proceeds they have collected through liquidation of collateral.

### JURISDICTION AND STANDARD OF REVIEW

The Bankruptcy Appellate Panel of the Sixth Circuit has jurisdiction to decide this appeal. The United States District Court for the Western District of Kentucky has authorized appeals to the Panel, and no party has timely filed to have this appeal heard by the district court. 28 U.S.C. §§ 158(b)(6), (c)(1).

———————————

[1]The Professionals are as follows: Chieftain's counsel: Dinsmore & Shohl, LLP; Committee's counsel: Bingham Greenebaum Doll LLP and Fox Rothschild LLP; Committee's financial advisor: Phoenix Management Services LLC.

A final order of the bankruptcy court may be appealed as of right.  28 U.S.C. § 158(a)(1). "Orders in bankruptcy cases qualify as 'final' when they definitively dispose of discrete disputes within the overarching bankruptcy case."  *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582, 586 (2020) (citing *Bullard v. Blue Hills Bank*, 575 U.S. 496, 501, 135 S. Ct. 1686 (2015)). Here, the discrete dispute is the post-confirmation motion for turnover.  The order denying the motion determines the parties' substantive rights and ends the dispute over that issue.

In their briefing, the parties did not fully agree on the appropriate standard of review. The Professionals asserted that the bankruptcy court's interpretations of the cash collateral orders, the plan, and the fee applications should be reviewed for abuse of discretion. (Appellants' Br. at 7.)  However, they qualified that statement as follows: "[t]o the extent the appeal involves review of the entire contract, including statutory construction of provisions of the Bankruptcy Code as applied to the contract, that review is *de novo*."  *Id*. (quoting *East Coast Miner LLC v. Nixon Peabody LLP* (*In re Licking River Mining, LLC*), 911 F.3d 806, 810 (6th Cir. 2018)).  In its brief, UCB asserted that the proper standard of review for this appeal is abuse of discretion.  At oral argument, however, UCB instead posited that the standard of review should be *de novo*.

The Sixth Circuit Court of Appeals has cautioned that "[t]he standard of review on appeal is determined by the nature of the action taken below by the bankruptcy court."  *Terex Corp. v. Metro. Life Ins. Co.* (*In re Terex Corp.*), 984 F.2d 170, 172 (6th Cir. 1993).  In *Terex Corp.*, the Sixth Circuit dealt with a situation where "the bankruptcy court interpreted the Plan, and then exercised its equitable powers to breathe life into the provisions of the Plan."  In that situation, the Sixth Circuit stated, "we review the interpretation of the Plan with full deference, [] and we review the bankruptcy court's exercise of its equitable powers under an abuse of discretion standard."  *Id*. (citations omitted).

"Abuse of discretion" continues to be the appropriate standard in the Sixth Circuit when reviewing a bankruptcy court's interpretation of a plan or confirmation order.  *See Harper v. The Oversight Comm.* (*In re Conco, Inc.*), 855 F.3d 703, 709 (6th Cir. 2017) ("Where a bankruptcy court merely 'interprets' an ambiguous plan under its equitable authority, the decision is reviewed for an abuse of discretion."); *Official Comm. of Unsecured Creditors v. Dow Corning*

*Corp.* (*In re Dow Corning Corp.*), 456 F.3d 668, 675-76 (6th Cir. 2006) (Relying on *Terex*, the Sixth Circuit applied an abuse of discretion standard to review of a bankruptcy court's interpretation of a plan.). In *Conco*, the Sixth Circuit explained:

> In order to determine whether a bankruptcy court's decision "merely interpreted a plan, as opposed to modifying it, 'we turn to the reasoning and language in the bankruptcy court's … order.'" *Dow Corning*, 456 F.3d at 675 (quoting *Terex*, 984 F.2d at 172).
>
> ….
>
> The language of the Bankruptcy Court's decision makes it clear that it was only interpreting the Confirmed Plan, not modifying it. The Bankruptcy Court referenced the four corners of the Confirmed Plan to determine the parties' intent when drafting it. There was no language in the Bankruptcy Court's decision that indicated that it was attempting to modify the Confirmed Plan.

855 F.3d at 709-10.

In the present appeal, the parties disagree regarding the meaning of certain terms in the Plan. The bankruptcy court's decision is based on its interpretation of the confirmed plan and the Court's prior cash collateral orders. In ruling, the bankruptcy court used phrases such as "the terms of the confirmed plan make clear" and "a review of the language used." The bankruptcy court stated that it used "basic rules of contract construction" to reach its conclusion.

The language found in the bankruptcy court's decision demonstrates that the bankruptcy court was engaged in the interpretation of the plan and its own orders, rather than modification of the plan or orders. Likewise, the bankruptcy court's decision does not require any analysis of statutory language in the Bankruptcy Code or an application of the Code to the plan. Accordingly, the appropriate standard of review is one that gives deference to the bankruptcy court's interpretation.

**FACTS**

There are no contested facts in this case. Instead, the Professionals and UCB disagree about the intent and meaning of a cash collateral arrangement and the effect of a confirmed Chapter 11 plan as it relates to payment of fees. A "Carve-Out" provision, dealing with how the Professionals would be paid, is at the heart of the dispute.

Chieftain Steel, LLC ("Chieftain") filed a Chapter 11 petition in May of 2016, and the United States Trustee promptly appointed the Committee of Creditors Holding Unsecured Claims. The bankruptcy court subsequently authorized the Committee's retention of two law firms and a financial advisor as well as Chieftain's retention of a law firm.

Within approximately two months of the bankruptcy, Chieftain and the Committee negotiated an interim cash collateral order with UCB, with typical arrangements for use of cash collateral to keep Chieftain's business operating during the pendency of the bankruptcy. After two additional interim versions, the bankruptcy court entered the first final cash collateral order on October 5, 2016. The final order included a critical provision as it relates to this appeal.[2]

The final cash collateral order provided for a Carve-Out for the payment of $20,000 per month for Debtor's counsel and another $20,000 per month for the rest of the Professionals. The order required that the Carve-Out be paid by Chieftain before payment of any indebtedness to UCB but with certain caveats. Specifically, the Carve-Out language provided:

> Payment of any amounts on account of the Post-Petition Replacement Liens, the United Cumberland Pre-Petition Indebtedness, and United Cumberland Pre-Petition Liens, shall be subject and subordinate to payment of the Carve-Out. For purposes of this Agreed Order, the Carve-Out shall mean (i) any, fees, costs, disbursements, charges and expenses (as allowed by the Bankruptcy Court) of attorneys, accountants and other professionals of (x) the Debtor retained in the Chapter 11 Case pursuant to Sections 327, 328, 330, 331 and 1103 of the Bankruptcy Code and (y) the Committee; provided, however that the aggregate amount of the Debtor's fees, costs, disbursements, charges and expenses entitled to priority as part of the Carve-Out under clause (i) above shall not exceed $20,000 per month and the Committee's fees, costs, disbursements, charges and expenses entitled to priority as part of the Carve-Out under clause (i) above shall not exceed $20,000 per month. **The Debtor shall pay the Carve-Out as funds permit without causing an overdraft.**

(First Final Cash Collateral Order § 9(a), ECF No. 139) (emphasis added).

---

[2]The prior two interim versions contained a nearly identical provision except that instead of providing for fees not to "exceed $20,000 per month," they provided for fees not to "exceed $20,000 until the final hearing." (Second and Third Interim Cash Collateral Orders §§ 9(a), ECF Nos. 101, 113).

The final cash collateral order included what ultimately became a crucial and determinative provision – that the Debtor was required to pay the Carve-Out to the Professionals "as funds permit without causing an overdraft."

The final cash collateral order was amended several times before the bankruptcy court confirmed the Chapter 11 plan, with each amendment containing the same Carve-Out language quoted above. The cash collateral orders required Chieftain to pay the Professionals up to a total of $40,000 per month, and UCB was not to be paid from cash collateral unless the Professionals were paid under the Carve-Outs. But, likewise, Chieftain was not required to pay either the Professionals or UCB unless sufficient funds from Chieftain's operations permitted the payments without causing an overdraft situation. The orders did not contain any language requiring UCB to pay the Professionals directly if the funds being generated by Chieftain's operations were insufficient to make the payments.

About four months after Chieftain filed bankruptcy, a related company – Floyd Industries, LLC – filed a Chapter 11 case.[3] In May of 2017, roughly a year after Chieftain's bankruptcy filing, the two debtors confirmed a joint plan of reorganization. As it relates to the fee question, the key language in the joint plan was as follows:

> [H]olders of Professional Fee Claims shall receive Cash in an amount equal to the allowed amount of their respective Bankruptcy Court–approved Professional Fee claims. . . . Any award by the Bankruptcy Court shall be paid in full in such amounts as are Allowed by an Order of the Bankruptcy Court, *first*, from any Carve-Out amounts held in escrow by an Entity asserting such Professional Fee Claim and, *second*, if Carve-Out amounts held by the Entity are exhausted, the Professional Fee Claim shall be payable as soon as practicable, and in any event within forty-five (45) days' of entry of an order approving the Professional Fee Claim. With respect to Professional Fee Claims arising after the Effective Date, the Reorganized Debtor shall pay such Professional Fee Claims in the ordinary course of business without the necessity of any Professionals being required to file an application for such Professional Fee Claims.

(Second Amended Joint Plan, § 3.05, ECF No. 253-1.)

---

[3]Floyd Industries is not a party to Chieftain's cash collateral orders with UCB.

The critical portion of the plan, as it relates to payment of professional fees, reflects several important components of the prior interim cash collateral orders.  First, payment of fees was tied to the ability of the Reorganized Debtor to pay – that is, "as soon as practicable" after any Carve-Out money had been depleted.  Second, there was nothing in the wording to shift the burden to UCB if it was not "practicable" for the Reorganized Debtor to pay the fees.

A few other provisions in the joint plan are relevant to the fee payment dispute.  The plan determined the amount of UCB's secured claim and included a payment structure.  The plan also provided that "UCB's existing Liens, mortgages and guaranties shall be deemed to be in full force and effect to secure to the Reorganized Debtor's obligations to UCB."  (Second Amended Joint Plan, § 4.02(b), ECF No. 253-1.)

Most importantly, as it relates to the liens, the plan contained no language that subordinated UCB's liens to the Professionals, no language granting a lien to the Professionals, and nothing making UCB's rights under the plan conditioned or in any way contingent on the Professionals getting paid.  Further, assets of the joint debtors vested in the Reorganized Debtor free and clear of all liens except as provided in the plan.

In short, Chieftain, now merged with Floyd Industries as a reorganized debtor known as Pennyrile Company LLC, was vested with property rights subject to UCB's liens but not subject to any lien rights of the Professionals.  Pennyrile took on the contractual obligation under the plan to pay the Professionals' outstanding fees "as soon as practicable," but the plan provided no real teeth to back up the promise.  The Professionals were not given lien rights, subordinate or otherwise.  And nothing in the plan required UCB or anyone else to pay the fees if it was not "practicable" for Pennyrile to do it.

Approximately two months after the plan was confirmed, the bankruptcy court entered orders approving pending fee applications of the Professionals.  Approved fees and expenses totaled almost $500,000.  Pennyrile made partial payments, but at the time an involuntary Chapter 7 petition was filed against Pennyrile, a little over $400,000 of the approved fees remained unpaid from either Carve-Out money or post-confirmation payments from Pennyrile.

After Pennyrile ended up in Chapter 7, the Professionals looked to UCB for payment of a large chunk of their fees.  They contend that about $225,000 of their allowed fees should come from UCB's collateral under the Carve-Out arrangement and that UCB is directly responsible for payment.  To pursue that theory, they filed a Joint Motion to Compel Turnover and Carve-Out Held by United Cumberland Bank (the "Turnover Motion").

The bankruptcy court denied the Turnover Motion, relying on the plain language of the pertinent documents. It noted that the cash collateral orders relating to payment of professional fees "clearly placed the responsibility . . . squarely on the Debtor."  *In re Chieftain Steel, LLC*, No. 16-10407(1)(11), 2019 WL 1225716, at *6 (Bankr. W.D. Ky. March 13, 2019).   The bankruptcy court further determined that "nothing in the Cash Collateral Agreement or the Confirmation Order required payment of the Professionals' fees directly from UCB."  *Id*.  The bankruptcy court also found that "nothing in the Amended Plan shifted the responsibility for payment of the Carve-Out from the Debtors to UCB."  *Id*. at 2.  It further concluded that UCB's treatment under the plan "was not made subject to any continued claims for attorneys fees or to a Carve-Out for pre-confirmation attorneys' fees."  *Id*.

## DISCUSSION

The Professionals have asserted several theories for why the Panel should hold UCB liable for the fees.  One argument is that UCB's liens were subordinated to the Professionals under the Carve-Out language in the cash collateral orders.  This argument fails, however, because that is not what the orders really say.  The orders provide that "[p]ayment of any amounts on account of the [UCB liens] . . . shall be subject and subordinate to payment of the Carve-Out."  Thus, the plain language required Chieftain to pay the Carve-Out first during each relevant time period before paying UCB.  This provision is not the same as granting a superior lien to the Professionals – especially since Chieftain was not required to pay either the Professionals or UCB unless it could be done from available funds without creating deficit spending.  The cash collateral orders do not contain lien-granting language nor do they contain any language making UCB directly responsible as a guarantor of Chieftain's obligations.

The Professionals also rely on separate language in another paragraph of the cash collateral orders that grants post-petition lien rights to UCB "[s]ubject to the Carve-Out." While it is theoretically possible to read that provision broadly enough to infer the granting of lien rights to the Professionals, it would again require ignoring other key elements of the Carve-Out language, specifically the language limiting the Carve-Out to available funds. UCB's rights being "subject to" the Carve-Out necessarily incorporates the caveat that the Professionals' rights are likewise contingent upon Chieftain generating enough money to pay the Professionals. Accordingly, this rationale also fails.

Adopting the Professionals' interpretation would demand that the Court treat that last sentence of the primary Carve-Out paragraph as meaningless. If UCB was obligated to pay the Professionals directly, it would have been easy enough to include a sentence saying that UCB would pay any shortfall if Chieftain had insufficient funds. Instead, the Carve-Out included the critical "as funds permit" language making it abundantly clear that there could very well be circumstances where the Carve-Out would not be paid at all.

In another approach, the Professionals assert that the bankruptcy court's holding fails to recognize that the Carve-Out survived the confirmation of the plan. Whether a carve-out in a cash collateral survives confirmation would be an interesting issue if the Carve-Out language in the present case expressly required UCB to pay the Professionals but an ambiguity or inconsistency was created by confirmation of the plan. This case, however, does not require any reconciliation of contradictory provisions in the cash collateral orders and the plan. To the extent it is necessary to consider the plan itself, the plain language in that document supports UCB's position rather than creates a conflict between the interim orders and the plan.

Just like the cash collateral orders, the confirmed plan does not contain language granting a lien to the Professionals. To the contrary, the plan vests the property in Pennyrile subject only to the liens of UCB. Just like the cash collateral orders, there is no language in the plan making UCB directly liable for payment. To the contrary, the plan says that, first, the Carve-Out money already in escrow will be used to pay fees, and then, second, the Reorganized Debtor will pay fees "as soon as practicable." (Second Amended Joint Plan, § 3.05.) There is no third

alternative under the plan that requires UCB to pay the Professionals once any escrowed money is gone and the Reorganized Debtor is unable to pay.

The Professionals contend that we should enforce the Carve-Out to assure the integrity of such arrangements in cash collateral orders and to stop lenders from avoiding responsibilities undertaken for the mutual benefit of a debtor and lender. However, what really happened here is that the bankruptcy court simply enforced what the parties negotiated.

Since there is no language in either the cash collateral orders or the plan expressly requiring UCB to pay the Professionals, there is no payment obligation that requires enforcement. Since there is no language in the cash collateral orders or the plan that granted a lien to the Professionals, there are no lien rights to enforce. In fact, instead of preserving the integrity of carve-out arrangements in general, accepting the Professionals' position could have the opposite effect. It would mean that clear language in an order could be ignored simply to reach a desired result.

The Professionals rely heavily on the Sixth Circuit Court of Appeals' recent decision in *East Coast Miner LLC v. Nixon Peabody LLP* (*In re Licking River Mining*, *LLC*), 911 F.3d 806, 810-13 (6th Cir. 2018). They contend that *Licking River* stands for the broad proposition that post-conversion cash may be used to pay professional fees pursuant to a carve-out. The bankruptcy court carefully considered *Licking River* and rightly determined its holding was not applicable to this case.

*Licking River* involved a situation where the parties anticipated the debtor's insolvency and potential conversion to Chapter 7 and spelled out how to deal with that scenario by including terms by which the lender was responsible for the professionals' fees. The Sixth Circuit placed importance on the specific carve-out language which repeatedly provided for payment of fees "at any time." The bankruptcy court expressly made the cash collateral order applicable in any superseding Chapter 7 case. In short, unlike this case, the pertinent language made it clear that the secured lender was intended to take on responsibility for the professional fees and that the responsibility would survive conversion to Chapter 7.

The lack of a confirmed plan to provide guidance about the parties' intent is also a significant difference in *Licking River*. Here, the parties successfully negotiated a plan of reorganization. The Professionals were no doubt heavily involved in those negotiations and would have known what they had been paid, what was still outstanding, and what had been placed into escrow from the Carve-Out. However, the plan included no provision to make UCB's rights under the plan subject to payment of outstanding attorneys' fees – other than providing that the money already held in escrow from the Carve-Out would be used as the first source for payment.

The bankruptcy court correctly concluded that *Licking River* does not stand for any blanket proposition about carve-out provisions but rather that interpretation of a carve-out in a manner to make a secured creditor directly liable is appropriate only "where the language of the document plainly sets forth such terms." *Chieftain Steel*, 2019 WL 1225716, at *4. We agree with the bankruptcy court's assessment that requiring a secured creditor or any other party to be directly responsible for fees would necessitate a very specific agreement setting forth those terms and approved by the court. The bankruptcy court correctly held that the documents in this case "are not as broad and far reaching regarding the responsibility for the payment of professional fees as in *Licking River*." *Id.* at *5

The Professionals, quite understandably, have pressed a policy argument favoring strict enforcement of carve-outs. However, the term "carve-out" does not have some magical meaning that assures that professional fees get paid by the secured creditor in all circumstances.

Any carve-out provision is simply a term in a contract, order or plan. It means whatever the pertinent document provides based on the words and context. No overriding policy considerations would justify reaching a result contrary to the plain language. In this case, the bankruptcy court simply applied the plain meaning in the cash collateral orders and the plan rather than invoking some type of equitable remedy not reflected in the words of the documents.

**CONCLUSION**

For the reasons stated, the Panel AFFIRMS the bankruptcy court's order denying the Turnover Motion.